1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
 2                 CENTRAL DIVISION AT LEXINGTON

 3

 4   UNITED STATES OF AMERICA,      )
                                    )
 5             Plaintiff,           )     5:09-CR-181-S
                                    )     Lexington, Kentucky
 6        vs.                       )     November 17, 2010
                                    )     1:28 p.m.
 7   BRYAN COFFMAN, MEGAN COFFMAN   )
     VADIM TSATSKIN, aka VICTOR     )
 8   TSATSKIN, and GARY MILBY,      )     EVIDENTIARY HEARING
                                    )
 9             Defendants.          )

10

11                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE KAREN K. CALDWELL,
12                UNITED STATES DISTRICT JUDGE

13

     APPEARANCES:
14
     FOR THE GOVERNMENT:       KENNETH TAYLOR
15                             KEVIN C. DICKEN
                               BRANDON MARSHALL
16                             Assistant United States Attorneys
                               Eastern District of Kentucky
17                             110 West Vine Street, Suite 400
                               Lexington, KY  40507
18
     FOR THE DEFENDANT         STEVEN RUSH ROMINES, ESQ.
19   BRYAN COFFMAN:            Romines, Weis & Young, PSC
                               600 West Main Street, Suite 100
20                             Louisville, KY 40202

21   FOR THE DEFENDANT         PATRICK J. RENN, ESQ.
     MEGAN COFFMAN:            Romines, Weis & Young, PSC
22                             600 West Main Street, Suite 100
                               Louisville, KY  40202
23                             (859) 619-3624

24

25
```

2

1   APPEARANCES:   (Continued)

2   FOR THE DEFENDANT          R. MICHAEL MURPHY, ESQ.
    GARY MILBY:                Law Office of R. Michael Murphy
3                              709 Mill Pond Road
                               Lexington, KY  40514
4
    Court Reporter:            Rhonda S. Sansom, RPR, CRR
5                              Federal Official Court Reporter
                               U.S. District Courthouse
6                              101 Barr Street, Room 413
                               Lexington, KY  40507
7                              (859)619-3624

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by mechanical stenography, transcript
    produced with computer.
25

3

1          (At 1:28 p.m. on November 17, 2010, with counsel for the

2     parties and the defendants present, the following proceedings

3     were had.)

4          THE HONORABLE KAREN K. CALDWELL:  Would the Clerk

5     please call the matter to come before the Court?

6          THE CLERK:  Yes, your Honor.  Lexington Criminal

7     Matter 09-181, United States of America versus Bryan Coffman,

8     Megan Coffman, and Gary Milby.  Called for an evidentiary

9     hearing.

10          THE COURT:  Would counsel for the United States make

11     its appearance for the record.

12          MR. TAYLOR:  Good afternoon, your Honor.  Ken Taylor,

13     along with Brandon Marshall and Kevin Dicken, for the United

14     States.

15          THE COURT:  Thank you, counsel.

16       Counsel for Mr. Coffman.

17          MR. ROMINES:  Steven Romines for Bryan Coffman, your

18     Honor.  He's present here in court.

19          THE COURT:  Mr. Romines, Mr. Coffman.

20       Counsel for Megan Coffman.

21          MR. RENN:  Patrick Renn for Ms. Coffman, who is

22     present here in court.

23          THE COURT:  Mr. Renn, Ms. Coffman.

24       And counsel for Mr. Milby.

25          MR. MURPHY:  Good afternoon, your Honor.

4

1    Michael Murphy for Mr. Milby, who is present in the

2    courtroom.

3            THE COURT:  Mr. Murphy, Mr. Milby.

4        This matter has been called for purposes of a hearing

5    regarding issues of privileged documents that were seized and

6    searched from defendant Bryan Coffman's law office.

7        Let me take a little time here to tell you how this arose

8    for purposes of the record, and also to outline how I

9    envision this proceeding going forward today.

10        As we know, the defendant, Bryan Coffman, is an attorney

11    whose legal office was searched subject to a warrant.  Now,

12    consistent with that warrant, the agents seized virtually all

13    of the documents, records, and accounts kept within that law

14    office without first examining them for purposes of relevancy

15    or privilege.

16        As is typical in that kind of search, the government

17    takes everything and preserves it and then subsequently

18    evaluates the information in terms of relevancy to its

19    investigation.

20        Also, as is typical in a search of a professional office,

21    the government comes into possession of things that are

22    completely irrelevant to the investigation and which are

23    subject to the attorney-client privilege held by third

24    parties represented by Bryan Coffman.

25        In a law office, it might also be reasonable to assume

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

5

1    that other documents seized in the search were subject to

2    other kinds of privileges and are otherwise private and

3    irrelevant to the government's investigation.

4        Accordingly, as has been represented here in court, the

5    government has taken measures that it says protects third

6    parties and avoids improper use of privileged materials by

7    employing what it refers to as a taint team to conduct an

8    independent review of the document -- all of the documents,

9    rather; to shield those documents that the team identifies as

10   clearly or questionably privileged; and to turn over to the

11   prosecutorial team documents that it believes may be

12   legitimately used in the course of the government's

13   investigation.

14       Now, at a hearing here last summer, and without citing

15   any legal authority or evidence, all defendants objected to

16   the use of the taint team process and in its papers have

17   claimed that all documents seized from a lawyer's office are

18   protected by the attorney-client privilege.

19       They then requested a hearing to determine, one, whether

20   the taint team process was an authorized or an appropriate

21   process; and two, to determine whether privileged material

22   was provided by the taint team to the prosecutorial team.

23       Now, first, the Court finds that as it was initially

24   phrased the defendants' request is out of order as overly

25   broad and unsupported by the law.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

6

1    Second, the Court determines that the objection or

2    question was not timely raised, as this was raised long, long

3    after the defendants had already been indicted in this case.

4    Also, the Court finds that the government does not bear a

5    burden of proving that privileged material has not been

6    disclosed to prosecutors.  In fact, I don't think the

7    government really has any burden of proof at this point in

8    the proceedings with respect to privileged documents.

9    However, in an abundance of caution, this Court is

10   requiring the government to put on the record evidence of the

11   process and the measures that it has employed to protect

12   privileged information and to reasonably assure that

13   prosecutors were given access to information to which they

14   were reasonably, legally entitled.

15   The defendant will have the opportunity to cross-examine

16   the government's witnesses and, if they have evidence

17   regarding irregularities of that proceeding, to present it.

18   Now, after that process has been identified and the

19   defendants have the opportunity to challenge the process,

20   let's assume for a moment that the Court finds that the

21   process is appropriate.  The Court would still envision that

22   the government will identify for the defendant those

23   documents it reasonably intends to use at trial, and it'll

24   have that continuing obligation, as it always does under the

25   rules, up through the trial itself.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

7

1       And if at any time during this proceeding the defendant

2  comes into possession of or identifies documents that it

3  believes that the government is using improperly this Court

4  will, on a continuing basis, entertain those objections and

5  concerns as they are raised by the defendant.

6       So I see us beginning a process here that will continue

7  all the way up through trial.  If at any point that this

8  defense team should come into possession of information that

9  it believes the government was not legitimately and legally

10 entitled to use, it bears the burden of coming forward with

11 specific objections by the person asserting the privilege.

12      In support of that finding, the Court cites In re Grand

13 Jury Investigation No. 83-2-35.  That's found at 723 F.2d

14 447.  It's a 1986 Sixth Circuit case.  Also United States v.

15 Goldfarb, 328 F.2d 280, Sixth Circuit, 1964.  And U.S. v.

16 Roxworthy, 457 F.3d 590, 2006.

17      So I hope that gives all of you a framework within which

18 we can operate regarding these materials.

19      So let's begin first by examining the process, the taint

20 team process.  I'll allow the government to put on its

21 witnesses, I'll allow the defendant to cross-examine and put

22 on any witnesses; and after that, we'll see where we go from

23 there.

24      Mr. Taylor?

25          MR. TAYLOR:  Your Honor, inasmuch as I could possibly

be a witness in the case, I'm going to turn this proceeding over to Mr. Marshall and leave the courtroom. I assume they will invoke the rule?

MR. ROMINES: I will invoke the rule, as well as to Ms. Bottoms.

THE COURT: Very well. Ms. Bottoms, Mr. Taylor, you may be excused.

(Ms. Bottoms and Mr. Taylor leave the courtroom.)

THE COURT: Now Mr. Romines has disappeared. Where did he go? I was hoping you didn't leave.

MR. ROMINES: I'll excuse myself, Judge. I left my pad outside.

THE COURT: I was going to say, Mr. Romines, you didn't invoke the rule as to yourself, I hope.

Very well. Mr. Marshall, you may proceed.

MR. MARSHALL: Judge, if I might, I would like to cover some housekeeping rules, as well, before I start.

THE COURT: You may.

MR. MARSHALL: The Court in its most recent order has requested some documents, and I have that.

THE COURT: All right. I will appreciate that. I'm sure the defense will, too.

MR. MARSHALL: Recognizing along the way there may have been a few documents photocopied twice. And I will give the caveat that I can't certify down to the page number, but

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

9

 1    I will say that we have 42,103 pages of documents that were

 2    provided to the filter team.

 3        Our analysis is complete.  It breaks down as follows.

 4    What's been termed green documents, 39,154.

 5            THE COURT:  Now, when you say "green documents," you

 6    mean those are documents that your team has determined are

 7    appropriate for the examination and use of the prosecutors?

 8            MR. MARSHALL:  Specifically, nonprivileged.

 9            THE COURT:  Okay.

10            MR. MARSHALL:  And of those documents, I can tell

11    your Honor that it is my understanding that that 39,154 pages

12    have all been provided now to the trial team.

13            THE COURT:  And when were those provided?

14            MR. MARSHALL:  That's going to come out in testimony,

15    your Honor.  There were a series of disclosures when that was

16    completed and provided.  I have a method, and we will provide

17    that to your Honor.  Most recently, yesterday was the final

18    submittal.

19            THE COURT:  All right.

20            MR. MARSHALL:  Of what our team deemed to be

21    privileged documents with no known exception or waiver

22    issues, what we have deemed, quote, red documents, 463 pages.

23        And yellow, that is potentially privileged; however, some

24    question or some possible waiver issue or other legal ground

25    to provide it, nonetheless, like crime fraud, for example,

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

1    there are 2,486 pages.

2        Neither the red nor the yellow, those latter two

3    categories, have been provided at all to the trial team.

4        And I have today provided to Mr. Romines a set of all

5    documents categorized by color.  It's a number of disks,

6    again, many of which will come in during the hearing today.

7        But in essence, as the green waves went along, disks were

8    made.  I provided Mr. Romines disks containing the documents

9    that went over in those green waves.

10        I have also provided to him red and yellow disks.  And of

11    course, as I said before, those have not been provided to the

12    trial team.

13            THE COURT:  All right.

14            MR. ROMINES:  Your Honor, I understand Mr. Marshall

15    is not a witness, but there are a couple of things I'd like

16    to -- I don't know how you want to proceed.  In regard to

17    what he had just provided, there are a couple of things if I

18    could get some clarification on them?

19            THE COURT:  You may.

20            MR. ROMINES:  There's approximately 42,000 pages

21    total, correct?

22            MR. MARSHALL:  Yes, sir.

23            MR. ROMINES:  Okay.  And about 3,000 -- or the 463

24    and 2,486, which is about 2,900, I guess -- have not been

25    provided to the prosecution?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

11

1          MR. MARSHALL:  Yes, sir.

2          MR. ROMINES:  But the remainder of the 42,000 have

3    been provided already?

4          MR. MARSHALL:  Anything that the government's filter

5    team has designated nonprivileged -- red or green -- has been

6    provided to the trial team.

7          THE COURT:  Very well.

8          MR. MARSHALL:  Over time.

9          THE COURT:  All right.

10         MR. MARSHALL:  And, your Honor, also for an estimate

11   of that body of green, how much the United States anticipates

12   using at trial, I have a rough estimate on that.

13         THE COURT:  Very well.

14         MR. MARSHALL:  Mr. Taylor, having reviewed the green,

15   tells me that he expects to utilize approximately in the

16   neighborhood of about 12,000 pages.  As that breaks down, he

17   believes it's about 1,000 actual documents.

18      For example, as he has explained to me, he may run across

19   a stack of 200 pages that are obviously all bank records from

20   one bank account, for example.  That would be 200 pages but

21   deemed by him one document.

22         THE COURT:  I understand.

23         MR. MARSHALL:  So it's roughly a quarter or so of the

24   green.

25         THE COURT:  And has or will the government be

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 12 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

12

1    identifying for the defense team those documents it

2    reasonably anticipates using at trial?

3         MR. MARSHALL:  Yes, your Honor.  As I said, the last

4    of the green disclosures was made yesterday, and so

5    Mr. Taylor has not completed fully that analysis.  But

6    absolutely, we will be prepared in coming weeks to provide

7    the defense a list of all green.

8        I would, though, flag for the Court, because the yellow

9    will not be given to the trial team until the Court blesses

10   it, we will not be able to give the defense a preview of any

11   yellow categorized documents, what the United States might

12   want to use at trial, because those will not go to the trial

13   team for analysis until your Honor rules.

14        THE COURT:  All right.  You may call your first

15   witness.

16        MR. MARSHALL:  Yes, your Honor.  The United States

17   calls AUSA Sam Dotson.  And with the Court's permission, may

18   I remain at counsel table?

19        THE COURT:  You may.

20        MR. MARSHALL:  You never know when I might need

21   Mr. Dicken's kind correction.

22       (Witness enters the courtroom.)

23       WILLIAM SAMUEL DOTSON, GOVERNMENT'S WITNESS, SWORN

24        THE COURT:  Please proceed.

25        MR. MARSHALL:  Thank you, your Honor.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

13

 1              DIRECT EXAMINATION

 2  BY MR. MARSHALL:

 3  Q.  Sir, please state your name for the record.

 4  A.  I'm William Samuel Dotson.  I go by Sam.

 5  Q.  And please spell your last name for Madam Court Reporter.

 6  A.  It's D-O-T-S-O-N.

 7          MR. ROMINES:  Does that go down?

 8          THE COURT:  Does it go down, Madam Clerk?

 9          THE CLERK:  I don't believe so.

10          THE COURT:  Mr. Romines, you can move so you can see

11  the witness.

12          THE CLERK:  I lied.

13          MR. ROMINES:  There we go.

14      (Projection equipment reconfigured by Mr. Romines.)

15  BY MR. MARSHALL:

16  Q.  Mr. Dotson, how are you currently employed?

17  A.  I'm an assistant United States Attorney in the London branch

18  office.

19  Q.  How long have you been there?

20  A.  Almost four years.

21  Q.  Now, were you assigned to head up the filter team or taint

22  team, as it's called, in connection with the United States

23  versus Coffman and others?

24  A.  Yes, sir; I was.

25  Q.  And what was your general understanding of the reasons for

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

14

1  the formation of that filter team?

2  A.  The reason for the formation of the filter team was to

3  prevent members of the trial team, to include the investigative

4  agents, from having access to documents seized during the search

5  warrants that were executed at Coffman's offices in Lexington,

6  Kentucky, and South Carolina.

7  Q.  And what specifically was your role within this filter team?

8  A.  My job was to review these documents that were seized;

9  determine whether or not they were nonprivileged, privileged, or

10  potentially privileged; and litigate any that might be

11  potentially privileged.

12  Q.  Now, were you provided some guidance about how this filter

13  team was to operate?

14  A.  Yes, sir; I was.

15        MR. MARSHALL:  Your Honor, I would ask that the

16  witness be shown Government's Exhibit 3, which I have

17  previously provided a copy to defense counsel and also given

18  the Court a courtesy copy of, as well.

19        THE COURT:  You may.  Madam Clerk, may I see it?

20        THE CLERK:  It's right there.

21        MR. MARSHALL:  It should be on the bottom of the

22  stack, your Honor.

23        THE COURT:  Thank you.

24  BY MR. MARSHALL:

25  Q.  Mr. Dotson, you said you got guidance in how to proceed on

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 15 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 975
**William Samuel Dotson, Direct Examination by Mr. Marshall**

1  the filter team.  What form did that guidance come in?

2  A.  It was in the form of a memorandum that was provided to me.

3  Q.  Do you recognize Government's Exhibit 3 that's been provided

4  to you?

5  A.  It is.  That's a copy of the memorandum with the

6  instructions for the filter team members.

7  Q.  Who prepared the memorandum?

8  A.  I believe it was Ken Taylor.

9       MR. MARSHALL:  Your Honor, I would move Government's

10  Exhibit 3 into evidence.

11       MR. ROMINES:  No objection.

12       THE COURT:  It will be admitted.

13     (Government's Exhibit No. 3 was admitted into evidence.)

14       MR. MARSHALL:  Thank you.

15  BY MR. MARSHALL:

16  Q.  Did you review this fully before you took up the filter team

17  analysis?

18  A.  Yes, sir; I did.

19  Q.  Now, were the filter procedures in the Coffman taint memo

20  blessed by the officials at the Department of Justice office in

21  Washington?

22  A.  Yes, sir; it was my understanding they were.

23       MR. MARSHALL:  Your Honor, I would ask to show the

24  witness Government's Exhibits 1 and 2, which have also been

25  provided to counsel.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

16

1          THE COURT:  You may.

2    BY MR. MARSHALL:

3    Q.  Sir, I would ask you to take a look at those and tell me

4    what they are.

5    A.  Yes, sir.  The document marked as Government's Exhibit 1 is

6    a letter sent to the Department of Justice requesting a proposed

7    search warrant of an attorney's office.  That's Mr. Coffman's

8    offices.  I think it would have included the memorandum as an

9    attachment to that.

10         Government's Exhibit 2 is the verification from D.C. from

11   the Acting Assistant Attorney General to the then-United

12   States Attorney, Jim Zerhusen, granting permission for that

13   warrant.

14   Q.  I would like you to go back to Government's Exhibit 1.  Who

15   signed that document?

16   A.  It's signed by then-U.S. Attorney James Zerhusen, and then

17   also Assistant United States Attorney Ken Taylor.

18   Q.  And back to Government's Exhibit 2.  Who signed that?

19   A.  It's signed by John C. Keeney, Deputy Assistant Attorney

20   General of the Criminal Division.

21   Q.  That's brief.  Will you read it?

22   A.  Sure.  After the initial formalities:  "This will confirm

23   your compliance with the United States Attorney's Manual

24   9-13.420 requiring consultation prior to seeking judicial

25   authorization for a search warrant for the premises of an

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
17

1  attorney who is a subject, suspect, or target."  And then it's

2  signed.

3        MR. MARSHALL:  Your Honor, I would ask that

4  Government's Exhibit 1 and 2 be admitted into the record.

5        MR. ROMINES:  No objection.

6        THE COURT:  They will be admitted.

7     (Government's Exhibit Nos. 1 and 2 were admitted into

8  evidence.)

9  BY MR. MARSHALL:

10  Q.  Now, who else was part of the filter team?

11  A.  Besides myself, initially Mandy Poynter, who is a paralegal

12  in our office.  There were also agents that were brought in that

13  were part of the search procedure.  They didn't take part in the

14  review of the documents but in the seizure itself.

15  Q.  So as it relates to the filter analysis, who participated?

16  A.  Myself; Mandy Poynter; a retired Postal Inspector, who was

17  also a contract employee with the Postal Service named Mike

18  Egnor; and an attorney with the United States Postal Service who

19  had prior experience in filter team matters named Mike Rea.

20  Q.  Okay.  Tell us about Mandy Poynter's role in the Coffman

21  filter team.

22  A.  Ms. Poynter assisted myself in going through the documents

23  that were seized from the offices of Mr. Coffman and making a

24  determination, initial determination, as to whether or not they

25  were privileged, nonprivileged, or potentially privileged.

**William Samuel Dotson, Direct Examination by Mr. Marshall**

1    Q.  Did she also help you disclose green documents to the trial

2    team?

3    A.  She did.

4    Q.  What was Mike Egnor's role on the filter team?

5    A.  Mike Egnor received the materials that were imaged off of

6    the computers from the offices and made a determination as to

7    relevancy as to those materials.  I don't believe he ever

8    actually made any determinations as to privilege, nonprivilege,

9    or so forth.  It was strictly relevant or nonrelevant.

10   Q.  Did he also organize the documents so they could be

11   reviewed?

12   A.  He did.

13   Q.  What about Michael Rea's role on the Coffman filter team?

14   A.  Mike Rea took the documents that were imaged from the

15   computer systems, the ones that were organized by Mike Egnor,

16   and made a determination as to whether or not they were

17   privileged, nonprivileged, or potentially privileged.

18   Q.  I think this topic is going to come up quite a bit, so I

19   want to clarify it.  You say "documents imaged from the computer

20   system."  Is it fair to say that the documents fall into two

21   categories, computer and noncomputer?

22   A.  I think it's -- yeah, that's probably a fair

23   characterization.

24   Q.  And Mr. Rea handled the computer aspect?

25   A.  He did, that's correct.

William Samuel Dotson, Direct Examination by Mr. Marshall

19

1   Q.  Now, searches took place in Lexington and South Carolina on

2   October 8, 2008; is that correct?

3   A.  Yes, sir.

4   Q.  What steps were taken prior to the searches to make sure

5   that all filter team members, including agents, were advised of

6   the filter team's purpose and function?

7   A.  There was a briefing that occurred the day before the search

8   warrants were executed.  In that briefing a memorandum was

9   given -- copies to all the agents that participated in the

10  searches -- and reviewed.  And they had an opportunity to ask

11  questions or --

12  Q.  To be clear, were you present at that meeting?

13  A.  I was, sir.

14  Q.  All right.  Having sat through that presearch meeting, to

15  your understanding were trial team members to physically

16  participate in the searches?

17  A.  No, sir; they were not.

18  Q.  Why not?

19  A.  As an added layer of I guess filtering, it was determined

20  rather than for trial members to be present, or trial team

21  members or investigative agents to be present during the search,

22  in order to keep them from accidentally seeing some document

23  that they might not otherwise be entitled to see, that they were

24  to stay off the premises.

25  Q.  Okay.  So you have told us that the memorandum you

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 20 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
20

1  identified for the Court was covered at this meeting?

2  A.  Yes, sir.

3  Q.  And you said it was provided to the agents?

4  A.  Yes, sir.

5  Q.  Now, in all fairness, did that memorandum call for the trial

6  team agents to sit out the searches?

7  A.  No, it did not.

8  Q.  What did it call for?

9  A.  The approved memorandum, which has been marked and entered

10  as Government's Exhibit 3, called for the agents to be present

11  and assist in going through the seizure of the materials; and if

12  they came across a document that they thought was questionable

13  to provide it over to one of the filter team agents, who would

14  then look at it and contact myself or someone else involved in

15  the review process and make a determination.

16  Q.  So at some point, was a decision made to vary from the memo?

17  A.  Yes, sir; it was.

18  Q.  How would you characterize that decision, and why did you

19  not follow the memo from that point?

20  A.  Well, again, the -- I think the basis for that decision was

21  to ensure that no members of the filter team would have

22  accidental review or accidentally see one of these documents

23  that were seized.  It was another layer of protection.

24  Q.  Mr. Dotson, I think you just said that it was to ensure that

25  no members of the filter team?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
21

1   A.  I'm sorry, the trial team.  I misspoke.

2   Q.  So to ensure that no members of the trial team had even

3   momentary access?

4   A.  That's correct, sir.

5   Q.  Well, if the trial team agents weren't doing the search, who

6   was to conduct the searches?

7   A.  There were agents brought in from various Postal Service

8   offices that actually conducted the physical searches.

9   Q.  Now, were these agents brought in specifically to add this

10  additional layer of protection for the defendants' privileges?

11  A.  That was my understanding.

12  Q.  Back to this presearch meeting for a moment.  Were the

13  agents fully briefed about their responsibilities?

14  A.  Yes, I believe so.

15  Q.  And you were present?

16  A.  Yes, sir.

17  Q.  Did they have opportunities to ask questions if they didn't

18  understand?

19  A.  They did.

20  Q.  Were the logistics of the searches covered?

21  A.  Yes, sir; they were.

22  Q.  Were the agents specifically briefed about the filter

23  procedures?

24  A.  Yes.

25  Q.  Now, was standards explained about which documents would be

**William Samuel Dotson, Direct Examination by Mr. Marshall**

1    sealed and treated as tainted?

2    A.   No.  Ultimately, the decision was made to treat all

3    documents basically as potentially privileged and then brought

4    in for review by -- it would have been myself or Ms. Poynter

5    primarily, initially.

6    Q.   So are you saying the decision was made to treat everything

7    initially seized as a taint?

8    A.   Yes, I think that's an adequate way to characterize it.

9    Q.   Now, in all fairness, was that what the memorandum called

10   for?

11   A.   It's not; but again, it was a way to provide an extra layer

12   of protection to the search process.

13   Q.   So were the agents advised to seal up all documents and

14   bring them to you?  Is that how it was to work?

15   A.   That's how it worked, sir.

16   Q.   And did they fully comply with that requirement?

17   A.   To my knowledge, yes.

18   Q.   Did you make any presentation at this presearch meeting?

19   A.   I may have made a few brief comments; but as far as the

20   presentation, no, not anything in the form of --

21   Q.   In the context of the meeting, in light of all that was

22   covered, the document that was reviewed and so forth, did you

23   feel the need to make any statements about the filter team?

24   A.   I did not.  I felt the process was clear, once the meeting

25   was over.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

23

1    I also recall giving -- I can't recall if I gave it to

2    everyone, it seems like I may have wrote it on a board or

3    something, maybe passed out cards.  But I gave my contact

4    information, my numbers, in case something came up during the

5    search that I could be contacted and reached, both my cell and

6    my office number.

7    Q.  Now, after you left that meeting, was there any doubt in

8    your mind that members of the filter team were well notified

9    about what they were supposed to do?

10   A.  No.

11   Q.  Was there any doubt in your mind that the filter team

12   members were on notice that they were to protect privileged

13   documents and keep them away from the trial team?

14   A.  No, sir; that was the purpose of having the filter team in

15   place.

16   Q.  All right.  Now, after the searches, what happened to the

17   paper documents that were seized in Lexington?

18   A.  The actual physical documents were boxed up.  They were

19   brought to the London U.S. Attorney's Offices, where I was

20   present and participated in receiving those documents.

21   Q.  Were they sealed when they arrived?

22   A.  Yes, sir; I believe they were.

23   Q.  What happened to the electronic materials seized in

24   Lexington?

25   A.  I believe they attempted to write some of the computers over

William Samuel Dotson, Direct Examination by Mr. Marshall

24

1   or image them over there at the scene; but for whatever reason,

2   they couldn't get all of them.  So I think what happened was the

3   hard drive from the server was physically seized and taken to

4   another location by one of the members of the Postal team to be

5   imaged at a facility that could better access it.

6   Q.  After all that forensic imaging of the computer materials

7   has occurred, where did the materials go?

8   A.  The imaged materials?

9   Q.  Yes, sir.

10  A.  They came to myself on a computer disk.

11  Q.  All right.  What happened to the paper documents that were

12  seized in South Carolina?

13  A.  The paper documents that were seized in South Carolina were

14  also physically transported to my office in the -- at the London

15  U.S. Attorney's Office.

16  Q.  Were they sealed when they arrived?

17  A.  Yes, sir.

18  Q.  Tell us physically how the materials brought to you in

19  London were stored.

20  A.  We took the materials.  There's an unused conference room in

21  the basement portion of our office.  We took those, loaded them

22  all up on dollies -- they were numerous boxes -- and basically

23  filled that conference room with those materials.

24  Q.  Who had access to that room after those documents were

25  placed in there?

**William Samuel Dotson, Direct Examination by Mr. Marshall**

1   A.  The conference room was locked.  And as far as I know, I

2   believe at that time I had the only key to that conference room,

3   was my understanding.

4   Q.  And did you keep that key?

5   A.  Yes, I did.

6   Q.  Are you sure you kept that room locked?

7   A.  Yes, as far as I can recall, it was.

8   Q.  Now, do any members of the trial team, as you understand it,

9   work in the London U.S. Attorney's Office?

10  A.  No, they don't.

11  Q.  Are you aware of any trial team members entering that locked

12  room while the documents were in there?

13  A.  I'm not aware of any such activity.

14  Q.  Did there come a time when the documents were sent to the

15  Litigation Technology Service Center, which is also known as

16  LTSC, in Columbia, South Carolina?

17  A.  Yes, sir; they were.

18  Q.  What do they do at LTSC?

19  A.  LTSC is a facility that's utilized by the Department of

20  Justice to assist in the management of large-scale discovery

21  matters involving like documents such as this case.  We sought

22  approval to have the documents sent there and placed in a

23  computer format so that they could be readily reviewed by the

24  taint team.

25  Q.  Now, how were the documents shipped to LTSC?

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 26 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 998
William Samuel Dotson, Direct Examination by Mr. Marshall
26

1  A.  I believe they were shipped through FedEx.

2  Q.  Were they sealed?

3  A.  Yes, sir; they were.

4  Q.  Did LTSC know they were coming, or did you just pop them in

5  the FedEx to them?

6  A.  No.  As stated, we had -- you had to get prior approval

7  before you utilized the LTSC facility.  We sought that approval,

8  received it, and we sent the documents to them.

9  Q.  Before you sent this stuff, was LTSC somehow sensitive to

10  the fact that this was potential evidence?

11  A.  They were.  I believe that Mandy Poynter had informed them

12  this was in fact a taint team or filter team procedure.

13  Q.  So also they were notified it was not only potential

14  evidence but possibly attorney-client material?

15  A.  Yes, sir; they were.  And in that regard, I recall them

16  sending us a list of the individual attorneys that would be

17  working on the project down there so they wouldn't be

18  conflicting.

19  Q.  Did they also ask you for any known sort of hot names,

20  defendants, or things to make sure there were no conflicts?

21  A.  I believe they were provided with the information that was

22  set forth in the affidavits concerning the targets of this

23  investigation and so forth so that they could delete those

24  individuals through that, since there were corporate entities

25  involved, as well.

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 27 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 997
**William Samuel Dotson, Direct Examination by Mr. Marshall**

27

1    Q.  After all that had been done, what did LTSC eventually do in

2    processing the documents?

3    A.  They placed the documents, again, in a computer format.  I

4    believe they placed them on the disks, and I'm not sure how many

5    total disks there were.  But in a format that we could access on

6    a program that we utilize called IPRO to manage the documents

7    and go through them.

8    Q.  Let's talk about how they organized the documents for you.

9    For example, if LTSC got into a box, pulled out a manila folder

10   that says "John Smith" on it and it contained 200 documents

11   inside of it, what would LTSC do electronically with that?

12   A.  That, on the computer format, the document, the file for

13   those sets of documents would be listed as, I believe you said

14   "John Smith."  Just John Smith, for example, and the 200

15   documents will be maintained under that file heading.

16       It was also -- in addition to making it easier to review,

17   it was also for us to be able to keep track of these

18   documents to not get them confused from the format in the way

19   they were brought to us from the offices without going

20   through the hard copy, flipping through, and things getting

21   misplaced and so forth.

22   Q.  Once they were done over there, how were those documents

23   returned to the Eastern District from LTSC?

24   A.  Initially, I believe they were received -- are you talking

25   about the physical documents or the scanned copies?  Because I

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

28

1  believe initially we received the scanned copies, and then a

2  month or so later we received the hard copies of the documents.

3  Q.  Let's talk about the hard copies of the documents.  How did

4  they come back to the District?

5  A.  They came back to the District, I believe it was through

6  FedEx, actually to the Lexington office.

7  Q.  Now, when they were delivered to Lexington, was it your

8  understanding that they were sealed in some way?

9  A.  It is.  I wasn't present there, obviously.  I worked out of

10  the London office.  But in my discussions with Ms. Poynter, the

11  documents were received back sealed and they were placed in an

12  unused office in the Lexington facility.

13  Q.  And again, to be clear, Ms. Poynter was a paralegal working

14  with you as a member of the filter team?

15  A.  She was, that's correct.

16  Q.  And she told you those boxes were sealed?

17  A.  Yes, sir.

18  Q.  All right.  You mentioned also receiving electronic versions

19  back a little earlier.  Where did those land?

20  A.  Those also went to Lexington.

21  Q.  And who kept them?

22  A.  I believe Ms. Poynter kept them initially.  At some point,

23  they were turned over to our tech people who put them on the

24  IPRO system for us.

25  Q.  Before we get off the disks, when they came back were they

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
29

 1  password protected, to your understanding?

 2  A.  They were.  When they were received back, they did have some

 3  type of encryption password.

 4  Q.  You mentioned this IPRO a couple of times.  Let me ask you

 5  about that.  What is IPRO, more fully?

 6  A.  IPRO is a system that we utilize.  It's a litigation

 7  assistance program.  What it does is help you organize documents

 8  in a computer format.  Again, much like what LTSC does, it's a

 9  way to organize large amounts of seized materials in a format

10  that makes it easily accessible.

11  Q.  Tell us a little more about the reasons behind you wanting

12  to load those into IPRO.

13  A.  Due to the amount of documents received and the resources

14  that we had available to go through and review these documents,

15  the decision was made that this was the best available tool to

16  be able to go through these documents, to keep them marked

17  appropriately, to organize them throughout this review process.

18  Q.  Would it in any way help you to prevent mixing or jumbling

19  documents accidentally?

20  A.  Yes.  Again, part of the concern was, with the amount of

21  physical documents that there were, to keep from placing

22  documents in incorrect folders as multiple people were going

23  through them.  It was a way -- you had one format, and you could

24  just go through.  They were already there.  You didn't have to

25  take them out, put them back in.  You could just go through the

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
30

1    folders and look at them as you wanted.

2    Q.  So was it a useful tool?

3    A.  Yes, sir; it was.

4    Q.  Did it help you speed along?

5    A.  It did.

6    Q.  Who can access this IPRO?

7    A.  There's an administrative log-in.  I assume anyone who has

8    the administrative log-in can access the IPRO system.

9    Q.  Did you conduct your portion of the filter analysis in this

10   IPRO?

11   A.  I did, out of the London office.

12       And another reason for putting it in IPRO was the fact that,

13   again, at this time the two individuals working on the filter

14   process was myself and Ms. Poynter.  Where she was in the

15   Lexington office and I was in the London office, this allowed us

16   a means of doing this without doubling over work or someone

17   having to travel back and forth.  It allowed us to get access

18   from our work stations.

19   Q.  Now, given where you had originally stored the documents in

20   that locked room in London, did it also make it easier

21   electronically for you both to work simultaneously?

22   A.  Yes, exactly.  I'm sorry, that would have been a better way

23   to say what I was trying to get across.

24   Q.  As you reviewed these documents, how did you personally

25   categorize them?

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 31 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
31

1    A.   I believe they were categorized primarily as privileged,

2    nonprivileged, or potentially privileged.  There were flags that

3    you could put on each document as you went through and tag them,

4    and the system would organize them so you could pull up just

5    those documents.

6         Also throughout the process we developed several other

7    flags, like for particular companies' names and so forth, so

8    it would make it easier to sort through later.

9    Q.   You mentioned the phrases "tag" or "flag."  Is that

10   interchangeable?

11   A.   Yes.

12   Q.   Help me understand essentially what you are talking about.

13   Is that essentially an electronic sticky note?

14   A.   That's a good way to put it, only it can't be removed or

15   lost.  It would stay on that document.

16   Q.   So once tagged, that document doesn't accidentally become

17   untagged?

18   A.   Yeah, I think that's correct.

19   Q.   Okay.  No risk of that sticky note falling off, as it were?

20   A.   That's what I was -- yes.

21   Q.   Okay.  As you catalog these things in IPRO, does IPRO also

22   make it easier for you to delineate the different categories?

23   Say, for example, you want to pull up only green documents, is

24   that easily done in IPRO?

25   A.   As I stated, you could easily go back and access the

William Samuel Dotson, Direct Examination by Mr. Marshall

32

1   documents that were flagged or tagged under one of these

2   particular tags.  Like you could pull up all nonprivileged

3   documents, all documents related to John Doe, if there were tags

4   or flags used for that.

5   Q.  Did you initially take steps to disclose documents that were

6   nonprivileged, or what we refer to as green, with the trial

7   team?

8   A.  Yes, sir; we did.

9   Q.  Now, in doing that, were you acting consistently with the

10  filter team memorandum approved by the Department of Justice?

11  A.  Yes, sir.

12  Q.  Is it your understanding that the filter team memorandum

13  approved by the Department of Justice blessed you handing over

14  what you deemed to be nonprivileged documents?

15  A.  Yes, sir; the way I read the memorandum, that's correct.

16  Q.  How many times did you disclose documents viewed via IPRO to

17  the trial team?

18  A.  When you say "you," I assume you're referring to the filter

19  team as a whole?

20  Q.  Yes, sir.

21  A.  Any disclosures that we made would have been through

22  Ms. Poynter.  There were two occasions that I recall

23  nonprivileged materials from the IPRO system being disclosed to

24  the trial team.

25        MR. MARSHALL:  Your Honor, I would ask that the

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 33 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
33

 1   witness be shown Government's Exhibits 4 and 6A and B,

 2   previously provided to defense counsel.

 3        MR. MURPHY:  What are the numbers, Brandon?

 4        MR. MARSHALL:  4, 6A and B.

 5        THE COURT:  Do you all need some exhibit stickers so

 6   you can keep it all straight?

 7        MR. MARSHALL:  I have labeled exhibits for the Court.

 8        THE COURT:  Give Mr. Romines some, Madam Clerk.

 9   We've all got some so we will have the same thing.

10        MR. MARSHALL:  I will be telling the Court that I

11   won't be pulling them up in any computer system.

12        THE COURT:  I understand; but for Mr. Romines'

13   purposes, he may need to know, so if you will match those up

14   there.

15     (Mr. Romines and Mr. Marshall confer.)

16        THE COURT:  There are two disks, one labeled 6A and

17   one labeled 6B?

18        MR. MARSHALL:  Yes, ma'am.

19        THE COURT:  And another, Exhibit 4?

20        MR. MARSHALL:  Yes, ma'am.

21   BY MR. MARSHALL:

22   Q.  Mr. Dotson, do you recognize Government's Exhibit 4?

23   A.  Government's Exhibit 4 is a computer copy or imaging of the

24   nonprivileged documents that were provided to the trial team, I

25   believe, on or about March 24, 2000.

William Samuel Dotson, Direct Examination by Mr. Marshall

1    Q.  And what are Government's Exhibits 6A and 6B?

2    A.  6A and 6B would have been -- this is also two computer disks

3    reflecting nonprivileged documents that were provided to the

4    trial team on or about May 1, 2009.

5         THE COURT:  Excuse me.  With respect to Exhibit 4, my

6    realtime says "2000."  What year did -- March 24, 2009, is

7    what you meant say?

8         THE WITNESS:  Yes, ma'am.  Yes, ma'am; I'm sorry.

9       And then 6A and B is from May 1, 2009.

10        THE COURT:  2009?  Okay.  Thank you.

11   BY MR. MARSHALL:

12   Q.  So was this March disk the first disclosure of green

13   documents to the trial team?

14   A.  When you say "green documents," I think that's a term that

15   came up later at the time.  We were just calling them

16   nonprivileged.

17   Q.  All right.  And the May disks that you have, do those disks

18   represent the second disclosure of nonprivileged documents to

19   the trial team?

20   A.  It was.  And to be clear, I think there was some overlap.

21   I think some of the documents that were provided in the March

22   disclosure were also contained in the materials provided in the

23   May disclosure.

24        MR. ROMINES:  Is the date the date it was disclosed?

25   BY MR. MARSHALL:

William Samuel Dotson, Direct Examination by Mr. Marshall

1  Q.  Mr. Dotson, March 24, '09; to the best of your knowledge, is

2  that the date Government's Exhibit 4 was actually disclosed?

3  A.  It would have been on or about that date, sir; yes, sir.

4  Q.  The same way with 6A and B?

5  A.  Yes, sir; that would have been, that's correct.

6       MR. MARSHALL:  Your Honor, I would ask that

7  Government's Exhibit 4, 6A and 6B be entered into the record

8  but filed under seal.

9       MR. ROMINES:  No objection.

10      THE COURT:  No objection, the motion will be granted.

11    (Government's Exhibit Nos. 4, 6A, and 6B were admitted into

12  evidence and filed under seal.)

13      MR. MARSHALL:  Thank you.

14      THE COURT:  They will be filed under seal.

15 BY MR. MARSHALL:

16 Q.  Now, how did you ensure, as the filter team, that only

17 nonprivileged documents were handed over in these two

18 disclosures?

19 A.  They were documents that were tagged as nonprivileged on the

20 IPRO system, and they had been reviewed by myself and

21 Ms. Poynter.

22 Q.  Given the electronic nature of IPRO, does IPRO put yellow

23 documents in that actually had been tagged as green, for

24 example, and vice versa?

25 A.  Not that I'm aware of.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall

36

1    Q.  Is that why you used IPRO, to prevent that?

2    A.  Yes, sir; that's part of the reason we used it.

3    Q.  Who made the actual physical disclosures of the disks to the

4    trial team?

5    A.  I believe it was Ms. Poynter.  I did not, so it would have

6    had to have been Ms. Poynter.

7    Q.  And did the filter team keep copies of the disks in their

8    records to document what was given?

9    A.  I believe Ms. Poynter kept copies of the disk.

10   Q.  Now, did these disks, for lack of a better term, memorialize

11   what you did at this point?

12   A.  As far as nonprivileged materials, yes.  Or as far as

13   disclosure goes, yes, that's correct.

14   Q.  As your review went along, did you eventually stop sending

15   documents to the trial team, nonprivileged documents?

16   A.  Yes, sir; we did.

17   Q.  Why did you stop sending documents to the trial team?

18   A.  At some point in time, we were advised that all the

19   materials had been turned over to defense counsel.  We were

20   waiting for word as to whether or not they determined that any

21   of the documents they believed were privileged so that those

22   could be litigated before we went any further in the process.

23   Q.  To your knowledge, did Mr. Romines or any member of the

24   defense team ever designate with specificity any documents that

25   the defense believed to be privileged out of the universe that

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall

37

 1   was provided to them?

 2   A.   Not that I was made aware of.

 3   Q.   Now, let's jump back to these electronic materials you

 4   mentioned were imaged from the server in Lexington.

 5   A.   Yes, sir.

 6   Q.   You said those ended up with a forensic analyst in

 7   Cleveland, and I believe you testified he later sent those to

 8   you on disks?

 9   A.   He did; that's correct.

10   Q.   Where did you store the disks?

11   A.   The disks were stored in my office.

12   Q.   Did you eventually send a copy of that disk to someone else?

13   A.   I did.

14   Q.   Who did you send it to?

15   A.   I sent it to Mike Egnor, the retired Postal Inspector that I

16   mentioned earlier.

17   Q.   And I believe you already testified that he essentially

18   organized documents so that others could review them?

19   A.   And categorized them, I think, for relevancy and

20   nonrelevancy.  There were some materials that he couldn't access

21   from the disk, for whatever reason.  He didn't have the perfect

22   software to access those materials.  But of the materials that

23   he was able to gain access to, that's what he did.

24   Q.   I believe you told us Michael Rea is a Postal Service

25   attorney?

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 38 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
38

1   A.  Yes, sir; that's correct.

2   Q.  And you told us that he has experience doing these filter

3   reviews?

4   A.  That was my understanding; yes, sir.

5   Q.  And what city is Michael Rea in?

6   A.  I believe he also works out of Cleveland, Ohio.

7   Q.  When you say "also," to be clear, is that where the forensic

8   technician worked, as well?

9   A.  Yes, that's where the PC materials went initially.

10  Q.  Why was Michael Rea brought into the Coffman filter team?

11  A.  Well, for one reason, because he had prior experience doing

12  this; and for another reason, just the sheer volume of the

13  materials, we needed additional assistance in going through all

14  of these things.

15  Q.  Were there things going on with your caseload at the time

16  that required you to need some additional assistance?

17  A.  Yes, sir.

18  Q.  Without getting into details, just generally give us an idea

19  of what was slowing you down.

20        MR. ROMINES:  Judge, that doesn't matter.  His

21  caseload in regard to the procedures that happened in this

22  case doesn't really have any relevance.

23        THE COURT:  I understand.  Please proceed,

24  Mr. Marshall.

25        MR. MARSHALL:  Yes, ma'am.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 39 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
39

1   BY MR. MARSHALL:

2   Q.  What portion of the documents did Michael Rea specifically

3   review?

4   A.  He reviewed all of the materials that were imaged off the

5   hard drives of the computers, is my understanding.

6   Q.  So he reviewed the computer materials and your part of the

7   team reviewed the rest?

8   A.  Yes, that's a fair characterization.

9   Q.  Now, over the course of this filter analysis, have you

10  talked to Michael Rea?

11  A.  Yes, I have.

12  Q.  Have you gotten letters from Michael Rea --

13  A.  Yes, sir.

14  Q.  -- about the filter analysis?

15  A.  Yes, sir; I have.

16  Q.  Based on your contacts with Mr. Rea, is there any doubt in

17  your mind that he understood what his role was to be?

18  A.  No, sir; he had been part of the filter team's meeting and

19  understood that the purpose of this was to keep his materials

20  from the trial team until a determination could be made as to

21  their status.

22  Q.  How would you characterize his method?

23  A.  You -- you discussed -- you've said several times talking

24  about green, yellow, red.  He was the one that started first

25  utilizing that particular coding method.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

40

1    What he would do is, the materials that he deemed

2    nonprivileged he would place in what he would mark as green

3    folders, the materials that were potentially privileged in

4    yellow folders, and those that were privileged into what we

5    would mark as a red folder.

6    Q.  Now, did Michael Rea work in the IPRO, or did he work in

7    paper?

8    A.  No, I think he worked with hard copies.  He printed out

9    copies from the disks that were sent him and worked in paper and

10   put them physically in files that were marked "G," "R," "Y."

11   Q.  You've described for us your method; nonprivileged,

12   privileged, and then the group in the middle that might be

13   privileged, with the exception of otherwise questionable.

14   A.  Yes, sir.

15   Q.  Did Michael Rea's green, yellow, and red, as you understood

16   it, match that?

17   A.  I think that was just a different terminology; essentially,

18   the same idea.

19   Q.  As far as you know, did any member of the trial team work in

20   Cleveland?

21   A.  No, sir.

22   Q.  To your knowledge, did Michael Rea every disclosure any

23   documents to the trial team?

24   A.  Not that I'm aware of, sir.

25   Q.  As a matter of fact, what did Michael Rea do with the

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 41 of 171 - Page
ID#: 1001
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
41

 1   documents after he reviewed them?

 2   A.   After he reviewed them, he sent them back to me.

 3   Q.   How many times did Rea send the documents?

 4   A.   I believe that there were three separate occasions that I

 5   received mailings from Mr. Rea with documents.  I think maybe

 6   two boxes and then one envelope containing them, something to

 7   that effect.

 8   Q.   When he sent you documents back, were those the ones he had

 9   reviewed?

10   A.   Yes, sir.

11   Q.   You mentioned the folders or envelopes.  Were they always

12   categorized yellow, green, or red --

13   A.   Yes, sir; they were.

14   Q.   -- when they arrived to you?

15   A.   That's correct.

16   Q.   When you received a set of documents from Rea, what

17   physically happened to those documents?  Where were they stored?

18   A.   They were initially stored in my office in London.  They

19   were later moved out of my office to another location in the

20   building.

21   Q.   Now, during the time that they were in your office, were

22   they locked?

23   A.   On occasion.  Not always.

24   Q.   Do you have any reason to believe that any member of the

25   trial team entered your office during the time those documents

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 42 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1802

**William Samuel Dotson, Direct Examination by Mr. Marshall**

1    were in your office?

2    A.  Not that I'm aware of.

3    Q.  Do you have any reason to believe or do you have any

4    evidence that the trial team was in the London United States

5    Attorney's Office during the time the documents were in your

6    office?

7    A.  I don't recall -- I can recall maybe one or two occasions

8    where I have seen Rebecca Woolums there the last couple of

9    years.  I don't ever recall an occasion where Ken Taylor has

10   been in the office.  I know I have ran into him in court in

11   London, but I can't recall any occasions they've been in London

12   when I was there, other than the ones you mentioned.

13   Q.  Did they eventually leave your office?

14   A.  Yes, sir.  I eventually moved those documents to a secure

15   room, again in the basement of our office, secured with a punch

16   padlock, and they were placed in that room.

17   Q.  Who had the combination of the punch padlock?

18   A.  As far as I know, just individuals in the London office.

19   And I can't even tell you what it is, because it's not something

20   that is regularly used.

21   Q.  Okay.  Now, with regard to these documents you received from

22   Michael Rea in these three shipments, did you disclose any of

23   those documents that Rea returned to you over to the trial team?

24   A.  Can you repeat the question?  I'm sorry.

25   Q.  Of the documents that Michael Rea sent to you after he

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Direct Examination by Mr. Marshall
43

1   reviewed them, did you ever turn any of those documents over to

2   the trial team?

3   A.  Yes, sir; I did.

4   Q.  Okay.  What type of documents did you turn over?

5   A.  We turned over green documents to the trial team, I believe

6   on two separate occasions.

7   Q.  Now, how did you ensure that only green documents were

8   handed over?

9   A.  Well, they were in the folders marked as green,

10  nonprivileged.

11  Q.  Did you hand over all of the green documents that Mr. Rea

12  gave you?

13  A.  No.

14  Q.  All right.  I'm going to come back to that.

15       MR. MARSHALL:  In the meantime, I would like to show

16  defense counsel Government's Exhibit 5, labeled "Postal

17  12/5/09."

18      And Government's Exhibit 7, "11/13/09, Postal."

19       MR. ROMINES:  That's 7?

20       MR. MARSHALL:  Yes, sir.

21      I'd ask that these be shown to the witness.

22  BY MR. MARSHALL:

23  Q.  Mr. Dotson, please take a look at those disks.

24  A.  Okay.

25  Q.  Let's look at Government's Exhibit 7 first.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

44

1   A.  Sure.

2   Q.  Do you recognize this disk?

3   A.  I do.  It is a computerized copy of the imaging of the

4   documents that were turned over, I believe, in the second batch

5   of green documents that were turned over to the trial team that

6   would have occurred on or about -- no, I'm sorry, it's the first

7   batch -- November 15th of 2009.

8   Q.  And then the other exhibit?

9   A.  Exhibit 5 would be a computerized copy of the materials that

10  were turned over to the trial team, the second batch, on

11  December 5th, 2009.

12      And when I say an electronic copy, I believe what we turned

13  over actually was physical copies, hard copies of the documents

14  that were placed in a computerized format.

15  Q.  Just so I can clarify that, you are saying you handed over

16  the hard copy folders that Rea sorted?

17  A.  That's my understanding.  And that was done through

18  Ms. Poynter, but I believe we actually gave them hard copies of

19  it.

20  Q.  And so what do these disks do?

21  A.  These disks are computerized versions of the documents that

22  were turned over or scanned in.

23  Q.  Do they record what was given?

24  A.  Yes, sir; they do.

25  Q.  When you gave this stuff over, did you give anything other

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 45 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1905

**William Samuel Dotson, Direct Examination by Mr. Marshall**

45

1   than documents that had been deemed green or nonprivileged

2   documents?

3   A.  Nothing other than what was marked as nonprivileged was

4   turned over.

5        MR. MARSHALL:  Your Honor, I would ask that these two

6   exhibits be admitted into the record under seal.

7        THE COURT:  Very well.

8    (Government's Exhibit Nos. 5 and 7 were admitted into

9   evidence and filed under seal.)

10  BY MR. MARSHALL:

11  Q.  Let's go back to the question I asked you before.  You said

12  you did not turn over all the green documents that Michael Rea

13  provided to you.

14  A.  Yes, sir.

15  Q.  Why not?

16  A.  We received additional batches after we made these

17  disclosures.  At about that time was the time that we received

18  information that defense counsel was receiving all the documents

19  and was going to go through, make a determination that they

20  would be litigated later.

21  Q.  So as you told us earlier, you were standing down waiting

22  for the defense to designate specific documents?

23  A.  Yes, sir.

24  Q.  What happened to the green that you didn't hand over?

25  A.  They were stored in the London office.

William Samuel Dotson, Direct Examination by Mr. Marshall
46

1    Q.  Did you eventually provide them to someone?

2    A.  I did.

3    Q.  Who?

4    A.  Later -- well, earlier this year, I was informed that Tony

5    Bracke, an AUSA in the Covington office, would be taking over

6    the taint team responsibilities, the filter team

7    responsibilities.  Those materials were packaged up and sent to

8    him.

9    Q.  All right.  Let's talk about the red and yellow documents

10   that Michael Rea sent to you.  What happened to those when you

11   received them?

12   A.  Those were also maintained in the London office.  And again,

13   with the other documents that hadn't been reviewed yet or hadn't

14   been turned over yet, those were provided to Tony Bracke.

15   Q.  Just to sum up here, to be clear:  To your knowledge, did

16   Michael Rea ever turn any documents, regardless of color,

17   directly over to the trial team?

18   A.  No, sir; not that I'm aware of.

19   Q.  Did you, with the body of work that Michael Rea performed,

20   did you ever turn over any yellow or red documents to the trial

21   team?

22   A.  No, sir.

23   Q.  And I would ask you to tell me, to your understanding of

24   what Michael Rea did or didn't do, how do you base that

25   testimony?  What basis do you have to say that?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

47

1    A.   Based on my conversations with Mike Rea and correspondence

2    back and forth.   And the fact that when he finished review of

3    those documents he sent the materials back to me, and then they

4    were forwarded on to the trial team from -- from myself, the

5    ones that were provided.

6    Q.   Now, of the documents you received from Rea, did you ever

7    instruct or permit anyone to give the Rea yellow or red collated

8    documents over to the trial team?

9    A.   No, sir.

10   Q.   To your knowledge, has any member of the trial team ever

11   seen any of Rea's yellow or red documents?

12   A.   Not that I know of.

13   Q.   To your knowledge, has any member of the trial team ever

14   been told about the contents of any of the red or yellow

15   documents?

16   A.   Not that I know of.

17   Q.   All right.   You've alluded to this a little bit, and I want

18   to pick up here.   At some point along the way, were you replaced

19   as the head of the filter team by another attorney?

20   A.   Yes, sir; I was.

21   Q.   Who took over that filter team?

22   A.   Tone Bracke.

23   Q.   You told us he's an AUSA in Covington?

24   A.   Yes, sir; he is.

25   Q.   Roughly, when did that occur?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

48

1  A.  I believe I was informed of the change maybe in July of this

2  year.  I can't recall.  I think my initial contact with AUSA

3  Bracke was probably September, early September of 2010.

4  Q.  2010?  Now, you also told us that the sealed documents from

5  LTSC were in Lexington?

6  A.  Yes, sir.

7  Q.  By the time that Tony Bracke took over, did you have any

8  materials in London?

9  A.  We did.  We still had the remaining materials, the computer

10  materials that Mike Rea had reviewed.

11  Q.  Did you --

12  A.  And there was also another small box of items that were

13  seized from the office that weren't conducive to being scanned

14  in, like pamphlets, brochures, notepads, things like that, that

15  was also maintained in London.

16  Q.  Did you eventually send all that to Bracke?

17  A.  We did.

18  Q.  Were the remaining documents -- and I'm talking about the

19  ones in Lexington -- were they also provided to Bracke?

20  A.  That was my understanding, that the documents were provided

21  to Mr. Bracke.

22  Q.  Did you personally participate in that process in any way?

23  A.  I did not.

24  Q.  Just a few more, Mr. Dotson.

25    Over the course of your involvement with the Coffman

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Direct Examination by Mr. Marshall**

49

1    filter analysis, did you ever provide any red or yellow

2    documents, I mean any facially privileged documents or

3    potentially privileged documents, with possible exceptions?

4    I'm talking the yellow and red that's been defined here.  Did

5    you ever give over any yellow or red documents to any member

6    of the trial team?

7    A.  To the best of my knowledge, no.

8    Q.  To the best of your knowledge, did any other member of the

9    filter team ever give any member of the trial team red or yellow

10   documents?

11   A.  To the best of my knowledge, no.

12   Q.  So as long as you were part of the filter team, did any

13   documents go to the trial team without your prior knowledge and

14   specific approval?

15   A.  Not that I'm aware of.

16   Q.  Did any member of the trial team ever ask you or pressure

17   you to show them or tell them about the contents of the red or

18   yellow documents?

19   A.  No, sir.

20   Q.  As far as you know, whether by intentional act or even

21   mistake, has any member of the trial team seen even one page of

22   any red or yellow document?

23   A.  Not that I'm aware.

24   Q.  Has any member of the trial team been told even one iota of

25   the information contained in the red and yellow documents?

U.S. v. Coffman, et al, 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines

1  A.  To the best of my knowledge, they have not.

2       MR. MARSHALL:  If I could have one moment, your

3  Honor.

4       THE COURT:  You may.

5     (Cocounsel confer.)

6       MR. MARSHALL:  I believe that's all I have, your

7  Honor.

8       THE COURT:  Very well.  Mr. Romines.

9       MR. ROMINES:  Judge, first of all, I may not go as

10  quickly as possible because, your Honor, the documents that

11  the government turned over today, including the 14 pages of

12  the taint team instruction, we have been litigating this for

13  14 months, and they gave it to me five minutes before we

14  started the hearing.  So I may need to go a little slower.

15       THE COURT:  Do you need some time for a brief recess?

16       MR. ROMINES:  Judge, I'm ready to go now.

17       THE COURT:  All right.

18                    CROSS EXAMINATION

19  BY MR. ROMINES:

20  Q.  Mr. Dotson, of the 42- -- we're going to round off and use

21  42,000.  Of the 42,000 pages that we're concerned with today,

22  how many of those pages were not seized from Bryan Coffman's law

23  office?

24  A.  Of the 42-?

25  Q.  Of the 42,000 pages that we're talking about here, how many

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Romines**

51

1    did not come from a law office?

2    A.  I'm not sure.

3    Q.  Were you on the taint team?

4    A.  Yes, sir; I was.

5    Q.  Were you there when it occurred?

6    A.  I was not there at the search, no.

7    Q.  Everything that came from the search came to you, correct?

8    A.  Yes, sir; that's correct.

9    Q.  Did you maintain a log?

10   A.  Outside of what's on the IPRO system, no.  Our log would

11   have been what was -- what was entered into IPRO.

12   Q.  Now, pursuant to the filter team instructions, you're to

13   maintain a log of everything, aren't you?

14   A.  Yes, sir.

15   Q.  All right.  Other than the computer log, do you have

16   anything?

17   A.  Well, the computer log would be our log.

18   Q.  The answer to that would be "No," other than the computer

19   log?

20   A.  Other than the computer log; yes, that's correct.  I think

21   that's fair.

22   Q.  Okay.  Now --

23   A.  Well, there was also, I believe, evidence log sheets that

24   were brought in with each box that was brought in.

25   Q.  Okay.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 52 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
52

1   A.  To be signed off on.

2   Q.  Who prepared those log sheets?

3   A.  The agents at the scene, and then I would have signed them

4   when I received them at the London office.

5   Q.  Did you review them before you signed the log sheet?

6   A.  We went through the boxes briefly and then resealed them,

7   just to make sure that they matched up.

8   Q.  So to the question of the 42,000 pages, you don't know if

9   there were 42,000 pages or not, do you?

10  A.  I don't know the exact amount of pages, sir.  No, sir; I do

11  not.

12  Q.  How many pages of documents that were seized from Bryan

13  Coffman's law office were reviewed by a special master?

14  A.  None that I'm aware of.

15  Q.  None?  How many were reviewed by a judicial officer for

16  privilege?

17  A.  Well, sir, it was my understanding we were waiting on

18  defense counsel to designate which documents they deemed to be

19  privileged or nonprivileged so that that process could occur.

20  Q.  I'll ask that question again.  How many documents were

21  reviewed by a judicial officer for determination of privilege?

22  A.  None, to date.

23  Q.  Thank you.  All right.

24      And you were aware a document was provided to me back in May

25  of '08; is that right?  May of '09, excuse me.  Is that correct?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines

53

1    A.   I don't know what you're asking, really.

2    Q.   You -- you reviewed Government's Exhibit 4, correct?

3    A.   Yes, sir.

4    Q.   And provided that to the -- to the trial team on 3/24?

5    A.   Yes, sir; that's correct.

6    Q.   All right.  I had not reviewed that document at that time.

7    I had not received the -- this universe of documents to review

8    for privilege at this point, had I?

9    A.   It was my understanding that you received the documents from

10   the IPRO system.  Let's see, if I can take a moment to look that

11   up.

12   Q.   Please.

13   A.   At my notes.

14       I believe it was -- would have been -- I think it was

15   January of this year.

16   Q.   Okay.  January of 2010?

17   A.   Yes, sir.

18   Q.   All right.

19   A.   That's correct.

20   Q.   So to the question:  When you turned Government's Exhibit 4

21   over to the trial team I had not been provided this information

22   to make an objection to, had I?

23   A.   Not from our offices; no, sir.

24   Q.   All right.  Well, I wouldn't have been -- had any other

25   place to get it, would I?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
54

1   A.  No, sir; I don't suppose.

2   Q.  Okay.  And it had not been reviewed by a special master?

3   A.  No, sir.

4   Q.  And not been reviewed by a judicial officer?

5   A.  No, sir.  It was --

6   Q.  All right.

7   A.  It was turned over consistent with instructions in the

8   memorandum.

9   Q.  Okay.  Let's talk about that.  Do you have the memorandum in

10  front of you?

11  A.  I do.

12  Q.  All right.  Let's go to Page 9.

13  A.  Page 9?

14  Q.  Page 9 of the filter team instructions.  First full sentence

15  states:  "The filter team AUSA."  Now, that would be you,

16  wouldn't it?

17  A.  Yes, sir.

18  Q.  "Will furnish to the privilege holder a list of potentially

19  privileged material to be submitted to the Court for a review."

20  A.  Yes, sir.

21  Q.  Now, when you turned this over to the trial team on 3/24,

22  that was not done, was it?

23  A.  That's not potentially privileged material.  That would have

24  been designated as nonprivileged material.

25  Q.  And who made that determination?

1   A.   The filter team.

2   Q.   You did?

3   A.   Myself and Ms. Poynter.

4   Q.   And Ms. Poynter is a paralegal?

5   A.   Yes, sir; she is.

6   Q.   Okay.  Now, it also says:  "The filter team AUSA may consult

7   with current counsel for Bryan Coffman if such counsel is

8   identified."

9   A.   Yes, sir.

10   Q.   Now, I had been identified at that point, hadn't I?

11   A.   I'm not aware of when you were retained.

12   Q.   Had you ever asked anybody on the trial team if he was

13   represented, since it says you can consult with counsel?

14   A.   Not that I recall, sir.

15   Q.   Okay.  Would that have been helpful information to know, if

16   I object to any privilege here?

17   A.   Not at that time.

18   Q.   And why is that?

19   A.   Because once we turn the materials over to you, it's my

20   understanding that is when you would make the argument as to

21   whether or not these potentially privileged materials were in

22   fact privileged or nonprivileged.

23   Q.   But if you have already given them to the trial team, it

24   kind of negates the purpose of me objecting, doesn't it?

25   A.   Sir, I think you are confusing the issue here.  You're

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 56 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1016
William Samuel Dotson, Cross Examination by Mr. Romines
56

1    talking about potentially privileged items.  There's a

2    difference between nonprivileged items, items identified as

3    nonprivileged, and items identified as potentially privileged.

4    Q.  Well, now, I think we can agree, can't we, that what the

5    government considers nonprivileged and what my client considers

6    privileged might be different, mightn't they?

7    A.  Sure.

8    Q.  But we never got an opportunity to address that, did we?

9    A.  No, I turned them over consistent with the instructions in

10   the memorandum.

11   Q.  Same Page 9, the preliminary legal standard, bullet point 2.

12   Do you have that there?

13   A.  Yes, sir.

14   Q.  It says:  "The filter team shall treat as privileged any

15   letter, e-mail, memorandum, or other document maintained by

16   Bryan Coffman in his capacity as an attorney and one of his

17   clients?"

18   A.  Yes, sir.

19   Q.  That's privileged, correct?

20   A.  "Shall treat as privileged."  I don't think that's making

21   necessarily a designation, one way or the other.  I think in the

22   initial seizure and review of the documents we were to consider

23   that, is the way I understand that instruction.

24   Q.  How did you ultimately reconcile that if it's a -- if it's a

25   letter, e-mail, or document between Bryan Coffman and a client,

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 57 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
57

1  you're to treat it as privileged.  That's what it says, right?

2  A.  Yes, sir.

3  Q.  All right.  How did you untreat it as privileged?  Did you

4  just decide, "Hey, it may be a letter or communication, but

5  we'll give it over anyway?"

6  A.  We will take a look at it.  I don't recall the exact

7  process, it's been so long since I looked at the documents.  I

8  don't -- I wasn't necessarily prepared to answer questions along

9  that line here today.

10  Q.  What did you think that we were going to talk about today?

11  A.  The process utilized by the filter team.

12  Q.  I mean, Mr. Dotson, I think we can -- whether Ken Taylor

13  drove to London and broke into a room to look at documents,

14  nobody has ever disputed that.  Correct?

15  A.  Not that I'm aware of.

16  Q.  How the determination was made of privileged and

17  nonprivileged is what we're trying to talk about, right?

18  A.  That would --

19  Q.  How did you make that determination?

20  A.  Let me answer that.  That was not my understanding of what

21  the hearing here today was for.

22  Q.  Well, let's talk about it, since we are all here.

23  A.  Okay.

24  Q.  How did you make a --

25          MR. MARSHALL:  Your Honor, objection.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 58 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
58

1          THE COURT:  Yes?

2          MR. MARSHALL:  I understood the Court's order to be

3    that this was for the narrow purpose to determine the

4    procedure in place to safeguard documents from the trial

5    team.  I will concede, as the witness had, I didn't know we

6    were getting into the individual documents and the calculus

7    of that.

8          THE COURT:  I don't think Mr. Romines' question is

9    pointed to individual documents.  I think he is inquiring

10   into the process.  He's asking what process did you use for

11   determining whether or not something was privileged, and I'm

12   going to allow the witness to answer that question.

13         THE WITNESS:  To the best of my recollection, I would

14   go through, review the document, see if it involved strictly

15   communication between Mr. Coffman and someone who was

16   identified or appeared to be a client or whether or not it

17   was -- there was someone else or some other party cc'd on it

18   or another party involved in the decision.

19   BY MR. ROMINES:

20   Q.  And what did that -- I mean, if it's a communication between

21   Bryan Coffman and Victor Tsatskin, was that privileged or not

22   privileged, based on your determination?

23   A.  I think it would depend on what the communication was

24   related to, who else was maybe involved in the communication.

25   Strictly, without looking at the document specifically, it's

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 59 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1819
William Samuel Dotson, Cross Examination by Mr. Romines
59

1    hard for me to say.

2    Q.  Well, a communication between a lawyer and a client.

3    A.  Yes, sir.

4    Q.  All right?  We can start with the presumption that that's

5    privileged, correct?

6    A.  I think, according to the memo, yes.

7    Q.  All right.  And then you just reviewed it yourself and tried

8    to unprivilege it, or how did you do that?  That's what I'm

9    trying to figure out.

10   A.  I would make a determination as to whether or not there was

11   an exception that would have applied that would have, I believe,

12   clearly made that nonprivileged.

13   Q.  Okay.  Stop for a second.

14   A.  And other circumstances.

15   Q.  All right.  What exceptions?

16   A.  Again, whether or not a third party was involved in the

17   communication.  Whether or not this person was actually a client

18   or what this related to, if this related to a matter other than

19   representation or litigation.  Along those lines.

20   Q.  Did you have his client list?

21   A.  I don't recall.

22   Q.  Well, I mean, you just said, "I would make the determination

23   whether or not they were a client."  If you didn't have his

24   client list, how could you make that determination?

25   A.  I think it was based generally on the content of what was

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Romines**

60

1   being discussed in the communication.

2   Q.  Now, did you ever at any time, when you're reviewing

3   communications between Bryan Coffman and his client, who you

4   knew to be his client, Victor Tsatskin, all right?

5   A.  Yes, sir.

6   Q.  Ask a special master or anybody else to review that for

7   privilege?

8   A.  No, sir; I didn't.

9   Q.  All right.  Did you ever ask a judicial officer to review

10  that for privilege?

11  A.  No, sir.

12  Q.  All right.  And at least after May of 2009, you were aware

13  that I had objected that all documents seized from Bryan

14  Coffman's office were privileged, correct?

15  A.  I don't know that I was made aware of that.

16       THE COURT:  Let me ask a question here.  Has there

17  ever been a written objection regarding privilege filed in

18  the record in this case, ever, to this day, other than the

19  one that was raised here in open court in July?

20       MR. ROMINES:  Judge, without reviewing the file, I --

21  I can't tell you.

22       THE COURT:  I can tell you.

23       MR. ROMINES:  Okay.  Then --

24       THE COURT:  The answer is "No."

25       MR. ROMINES:  Perhaps --

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 61 of 171 - Page
ID#: 1021
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
61

1        THE COURT:  So let's end this right here and ask a

2   relevant question.  You haven't objected before this Court as

3   to the privilege of documents until July.

4        MR. ROMINES:  Your Honor, I advised Mr. Taylor that

5   all documents seized from that office should not be reviewed

6   by the -- by the trial team.

7        THE COURT:  That was -- that was an argument with

8   counsel.  Let's clarify.  Objections on the record in a court

9   of law are documents filed on the record in a court of law.

10   Arguments between counsel as to their respective positions

11   are different.  So let's be sure we're talking the same

12   terms.

13        MR. ROMINES:  That's fine, your Honor.

14        THE COURT:  Very well.

15   BY MR. ROMINES:

16   Q.  Even subsequent to May of 2009, did anyone review these

17   documents for privilege other than you?

18   A.  Other than myself or Ms. Poynter or Mr. Rea, no, not that

19   I'm aware of.

20   Q.  Now, Ms. Poynter, did she on her own review any documents

21   for privilege?

22   A.  Yes, sir; she would have.

23   Q.  And she's not even a lawyer, correct?

24   A.  No, sir; that's correct.

25        But to clarify, I went through and reviewed what

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 62 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1022
**William Samuel Dotson, Cross Examination by Mr. Romines**

1   Ms. Poynter would have marked in the IPRO system at some

2   point.

3   Q.  Was there a log made of that?

4   A.  No.  Other than myself just going through and reviewing it,

5   no.

6   Q.  Okay.  Now, the filter team instructions indicate that

7   you're to make a log of potentially privileged materials,

8   correct?

9   A.  Yes, sir; and that was done with the IPRO system.

10  Q.  Okay.  Now, did you review them yourself or just did the

11  IPRO system spit them out?

12  A.  Was that potentially privileged?

13  Q.  Yes.

14  A.  No, that would have been marked by myself or Ms. Poynter

15  through the review process.

16  Q.  Now, I want to back up just a little bit about this.  You

17  indicated that documents could be tagged as nonprivileged by the

18  IPRO system and would then be reviewed by you and Ms. Poynter?

19  A.  No, we would tag them as we went through.  We would put the

20  tags on them.

21  Q.  The IPRO system doesn't do anything on its own?

22  A.  No, sir; that's correct.  It has to be manually tagged by

23  the reviewer.

24  Q.  Now, when Mr. Rea -- you indicated he had participated in

25  taint teams before, correct?

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 63 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines
63

1    A.  That was my understanding; yes, sir.

2    Q.  Had you ever?

3    A.  No, sir; I had not.

4    Q.  When he sent the documents back, he indicated that -- you

5    have a list?  Do you have the numbers of the green documents

6    that he returned?

7    A.  I don't have the numbers.  I remember, it seems like there

8    might have been a sheet or something that had those on them at

9    some point, but I don't have that with me.

10   Q.  You don't know where it is?

11   A.  No, sir.

12   Q.  Did you review those documents yourself?

13   A.  Did I go back and review the documents?

14   Q.  That Mr. Rea had reviewed.

15   A.  No, sir; I did not.

16   Q.  You just turned the green ones over to the trial team?

17   A.  Yes, sir; I did.

18   Q.  And that was when again?

19   A.  That would have been -- the first batch of Mike Rea's

20   materials, I believe, that was turned over would have been on --

21   on or about November 13th.

22   Q.  13th?

23   A.  And that's what it says on the disk.  I think it's an

24   approximation, but it's very close to that.  And then again on

25   December 5, 2009.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Romines

1   Q.  And those were the computer documents?

2   A.  Yes, sir.

3   Q.  All right.  Now, those were still subject to the same filter

4   team instructions, correct?

5   A.  Yes, sir.

6   Q.  Privileged, any letter, e-mail, memorandum between lawyer

7   and client?

8   A.  I -- yes, sir.

9   Q.  All right.  Also, bullet point 4, the last bullet point on

10  Page 9:  "Filter team members should treat as potentially

11  privileged all materials prepared by an attorney during the

12  course of or in preparation of the criminal prosecution of Bryan

13  Coffman or civil litigation involved in connection with

14  Mr. Coffman or Global Energy Group, Mid-American Oil & Gas, and

15  American Oil & Gas."

16  A.  Yes, sir.

17  Q.  So were those items treated as privileged and not given to

18  the trial team?

19  A.  As we sit here today, I'm not sure.  I can't say.  I haven't

20  went back and reviewed them.

21  Q.  And again, that's what I'm trying to get to here.  This

22  filter team instruction clearly sets those things out as

23  privileged, doesn't it?

24  A.  As potentially privileged.

25  Q.  That one does, but the second bullet point says, "should

1    treat as privileged," correct?

2    A.  Yes.  And again, I think that means, if you read the

3    instructions at the top of the page:  "Agents viewing seized

4    items for potential privileged material should err on the side

5    of caution."

6        And what that's talking about, that's the instructions for

7    the agents that are physically present at the scene making the

8    determination, which ended up not happening.  As testified

9    previously, we treated everything privileged initially when it

10   was brought in and then reviewed it.  This is talking about the

11   initial seizure of the documents.

12   Q.  This only applied to the agents seizing the documents?

13   A.  Yes, sir; I believe that's right.  That's the way I

14   understand those instruction.

15   Q.  Did you have any instructions as to how you were to review

16   for privilege?

17   A.  Other than what's contained in the memorandum, no, sir.

18   Q.  Well, did this apply to you or just the agents?

19   A.  It -- it applies to both.  But this, if you read the first

20   paragraph, it expressly states:  "Agents will review seized

21   items for potentially privileged materials."

22       The way I read that, that's -- that particular portion is

23   talking about the determinations being made as these items are

24   being seized at the physical locations where the searches were

25   conducted.

**William Samuel Dotson, Cross Examination by Mr. Romines**

66

1   Q.  Okay, fine.  What guidance, what assistance did you have,

2   did you use, to make determinations of privilege?

3   A.  Just my own professional experience and knowledge; and then,

4   again, any guidance that was set forth in the memorandum.

5   Q.  All right.  And what knowledge did you have concerning this

6   particular case?

7   A.  The -- the specific facts of the case?  The memorandum, and

8   then I was also provided with copies of the affidavits for the

9   search warrants.  And outside of that and the briefing, I had no

10  other specific knowledge.

11  Q.  Okay.  What information did you have as to Bryan Coffman's

12  law practice as a whole?

13  A.  As a whole?

14  Q.  Um-hum.

15  A.  Other than what would have been contained in the memorandum

16  and the affidavits, that -- that would have been about it.

17  Q.  And no information on client lists or who would have been a

18  client?

19  A.  Not that I recall, sir.  Not that I can remember.

20  Q.  Now, during the review process, did you ever consult with

21  anybody from the trial team?

22  A.  Yes, sir; I did.

23  Q.  All right.  About what?

24  A.  If I came across a name or entity that I wasn't familiar

25  with, I might contact either Roberta Bottoms, investigating

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 67 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1027
William Samuel Dotson, Cross Examination by Mr. Romines
67

1   agent, or Ken, to ask them if they had any knowledge of that

2   entity or had heard of it through the course of their

3   investigation.  And that would have been probably the extent of

4   it.

5   Q.  So if you came across a name you didn't recognize, you

6   contacted Mr. Taylor or Ms. Bottoms?

7   A.  Yes, sir.

8   Q.  And asked them just what?  Who this person is?

9   A.  If you have any knowledge of this individual, this

10  individual or this entity.  If you know anything about them,

11  basically.

12  Q.  How often did that happen?

13  A.  I remember several occasions.  I don't want to say it

14  happened often, but I remember several times that occurred.  I

15  think Ms. Poynter did the same, as well.

16  Q.  And again, you had no guidance regarding consistency as to

17  what's privileged and what's not?  Guidelines?

18  A.  Guidelines?  Outside of the --

19          MR. MARSHALL:  Asked and answered, your Honor.

20          THE COURT:  Well, this is an informal hearing.  I get

21  the point; you asked it again, and he answered it again.

22          MR. ROMINES:  I'm trying to narrow it for purposes of

23  the hearing.

24          THE COURT:  I understand, you're trying to make a

25  record.

William Samuel Dotson, Cross Examination by Mr. Romines
68

1    BY MR. ROMINES:

2    Q.  Did you have any guidance?

3    A.  Outside of the memorandum, no.

4    Q.  And I understand you testified earlier about this memorandum

5    applying to you or not applying to you?

6    A.  That portion we discussed; yes, sir.

7         And I think it would have applied to me had I been

8    present at the search scene, but I think that portion is

9    specific as to what it means.

10   Q.  Why were the filter team responsibilities moved to a

11   different U.S. Attorney?

12   A.  Because I was in the midst of -- I was in the midst of a

13   trial and could not devote the time necessary to complete it, so

14   they were moved to Tony Bracke to finish it up.

15        MR. ROMINES:  Judge, I think that's all I have for

16   right now.  I would ask permission, your Honor, if I could

17   review this filter team memorandum, if something else comes

18   up if he's still on the stand.

19        THE COURT:  I offered to give you a recess.

20        MR. ROMINES:  I understand, Judge.  I'm finished now,

21   but if somebody else is cross-examining him and they're

22   finished --

23        THE COURT:  You can ask at the time.

24        MR. ROMINES:  Thank you, your Honor.

25        THE COURT:  If you want a recess to review something

**William Samuel Dotson, Cross Examination by Mr. Romines**

69

1    you claim someone gave you at the last minute, I'm not going

2    to let anybody sandbag anybody in this case.  So if you need

3    time, we'll take it right now.

4           MR. ROMINES:  I don't think I do, Judge, but....

5           THE COURT:  All right.  We have been here an hour and

6    a half, so let's take ten minutes.

7       (Recess taken from 3:00 p.m. to 3:12 p.m.)

8           THE COURT:  All right.  After your brief recess,

9    Mr. Romines, any more questions?

10           MR. ROMINES:  Just a few brief more, if I might,

11   Judge.

12           THE COURT:  You may.

13   BY MR. ROMINES:

14   Q.  On Page 5 of the filter memorandum, the first paragraph,

15   second full sentence, says:  "The filter team and agents will

16   maintain a log of all potentially privileged material reviewed,

17   identifying the material by type, date, sender, recipient, and

18   subject matter."

19   A.  Yes, sir.

20   Q.  "The reviewer will determine whether or not the material is

21   relevant and admissible."

22   A.  Yes, sir.

23   Q.  Where is the log?

24   A.  The way I read that instruction, that also applies to the

25   filter team agents that were present at the seizure.  Since we

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Romines**

70

 1   treated everything as privileged and boxed it all up, I don't

 2   think that applies to the -- the log was not created in that

 3   method.

 4   Q.  Well, it says -- do you have it in front of you?

 5   A.  I do, sir; yes, sir.

 6   Q.  It says:  "The log will indicate whether the material

 7   reviewed is relevant and its disposition."

 8   A.  Yes, sir.

 9   Q.  All right.

10   A.  And again, that was for agents working the seizure of this

11   scene.  Since we determined to treat all these materials as

12   privileged or potentially privileged and box them all up and

13   send them in for review, we did not do that because we took it a

14   step further, in my estimation.

15   Q.  Did those agents prepare a log?

16   A.  Not that I'm aware of, sir, no.

17   Q.  Next paragraph:  "The filter team AUSA will prepare a log of

18   all documents forwarded by the filter team agents."  That's you,

19   right?

20   A.  Yes, sir.

21   Q.  "To determine whether the material is privileged?"

22   A.  Yes, sir.

23   Q.  "And if so, whether the privilege has been waived."

24   Now, who can waive the privilege?

25   A.  Well, I think it depends on the situation.

U.S. v. Coffman, Det. 031, 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Romines**

71

1  Q.  Well, it would be the attorney or client waiving the

2  attorney-client privilege, correct?

3  A.  Yes, sir.

4  Q.  Did Mr. Coffman ever waive the privilege?

5  A.  Not that I'm aware of.

6  Q.  All right.  Did Mr. Tsatskin ever waive the privilege?

7  A.  I don't know.

8  Q.  Okay.  So in regard to subpart B there, the privilege was

9  never waived that you're aware of, was it?

10  A.  Not that I was made aware of, sir.

11  Q.  "Or whether some other exception to the privilege applies?"

12  A.  Yes, sir.

13  Q.  Did you make a determination if the exception applies?

14  A.  What I tried to do was make a determination as to whether or

15  not it was privileged, in the sense that if you look at the

16  legal guidance set forth on Page 10 through I think it's 15,

17  characterizations whether or not the communication was between

18  the client and the lawyer for the purpose of obtaining legal

19  advice, or whether there was a corporate matter, whether or not

20  it was a business decision as opposed to a legal matter, things

21  along those lines.  And in those cases, I think the case law is

22  clear that those would be nonprivileged matters.

23  Q.  So my question is:  Did you make the determination if an

24  exception applies?

25  A.  If it was an exception situation, I believe those would be

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Romines**

72

1   the materials that would be marked as potentially privileged to

2   be litigated at a later date.

3   Q.  Okay.  Now --

4   A.  If it was an exception or a waiver situation.

5   Q.  Well, there was no waiver, was there?  There was never a

6   waiver by anybody, was there?

7   A.  Not that I'm aware of.  That would have been litigated at a

8   later time.

9   Q.  You would be the only person aware of that, wouldn't you?

10  A.  I don't know.

11  Q.  Well, in regard to --

12  A.  Numerous people could be aware of it.

13  Q.  Well, before you're turning it over, there would have to be

14  a waiver, correct?

15  A.  I'm not trying to beat around the bush, I'm just trying to

16  answer the question.  I was not made aware of any waivers.

17  Q.  So you didn't turn anything over because it was waived, did

18  you?

19  A.  No, sir.

20  Q.  All right.  Now, same paragraph:  "If the filter team AUSA

21  believes that material was not protected due to waiver, an

22  exception to the privilege, or the like, he will submit the

23  material to counsel for Bryan Coffman for review" --

24  A.  Yes, sir.

25  Q.  -- "as to whether the material is or is not protected?"

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 73 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Renn
73

1   A.  Yes, sir; that's correct.

2   Q.  All right.  "If counsel does not concur with the filter team

3   AUSA's judgment as to whether a particular document or item is

4   not privileged, it will be submitted to the Court for final

5   determination."

6   A.  Yes, sir; that's correct.

7   Q.  Now, I did not concur that these items were not privileged,

8   did I?

9   A.  Which items are you referring to?

10  Q.  The items seized from Bryan Coffman's law office.

11  A.  Not that I'm aware of.

12  Q.  Okay.  They weren't turned over to the Court for final

13  determination, were they?

14  A.  They haven't been yet.

15  Q.  They were given to the trial team?

16  A.  The items identified as nonprivileged were.

17  Q.  39,000 items of the 42- were not given to the trial team?

18  A.  I don't know the number, sir.

19          MR. ROMINES:  Thank you.  That's all I have.

20          THE COURT:  All right.  Mr. Renn?

21          MR. RENN:  Thank you, your Honor.

22                          CROSS EXAMINATION

23  BY MR. RENN:

24  Q.  AUSA Dotson, I believe you said you were at the briefing

25  originally held regarding the taint team and what was going to

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 74 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1034
**William Samuel Dotson, Cross Examination by Mr. Renn**

74

1  happen at the time of the search; is that correct?

2  A.  Yes, sir; I was.

3  Q.  Who was in charge at that debriefing?

4  A.  To the best of my knowledge, I can't -- I can't recall who

5  led the debriefing, but to my recollection it was Ken Taylor

6  that was the primary speaker.

7  Q.  So he was on the trial team that you have been talking

8  about; is that correct?

9  A.  That's correct, sir.

10 Q.  Who was on the trial team?  Who are the members of the trial

11 team that you have been talking about?

12 A.  The members the trial team that I know about are Ken Taylor,

13 who is an AUSA lead attorney; Rebecca Woolums, the paralegal in

14 our office; and the lead investigative agent I believe was

15 Roberta Bottoms.  Those were the members that I can recall at

16 this time.

17 Q.  Were they all at the debriefing that you were talking about?

18 A.  I don't recall if they were all there or not.  I can't

19 recall who all was there.

20 Q.  But Ken Taylor, as you recall, is the one who was in charge;

21 is that right?

22 A.  That was my recollection, sir.

23 Q.  So you were the head of the taint team, but you weren't the

24 one in charge of the debriefing?

25 A.  That's correct.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Renn

75

1   Q.  And you all went over this memorandum that you were

2   questioned about on direct at the meeting?

3   A.  Yes, sir; we did.

4   Q.  You are saying, in your estimation, that parts of this

5   memorandum didn't apply to you?

6   A.  I think that's right.

7   Q.  That it may have only applied to the search investigators,

8   correct?

9   A.  I think that's correct, sir.

10  Q.  And you, yourself, you didn't go there as part of the search

11  team, did you?

12  A.  I did not; no, sir.

13  Q.  You didn't search at the law office in Lexington?

14  A.  No, sir; I was in London during the searches.

15  Q.  And you didn't search down in South Carolina?

16  A.  That's correct.

17  Q.  So you weren't there to make sure that this procedure was

18  even being followed; is that correct?

19  A.  In what regard?

20  Q.  Well, you weren't there to make sure if somebody wasn't

21  following this to keep a log, as Mr. Romines was asking you

22  about, you weren't there to see if that was being followed.

23  Correct?

24  A.  No, sir; but again, I didn't believe it was necessary,

25  because we made the determination that all items would be

1    treated as privileged that were seized and reviewed.

2    Q.  But you'll agree -- I'm not going to go back over this with

3    you again, but you will agree in the memorandum it was

4    anticipated and said that a log was going to be prepared?

5    A.  There was no log, other than the evidence log of the items

6    seized and the log that would have been created by IPRO.

7    Q.  So again, no log pursuant to this memorandum was prepared?

8    A.  Not specifically as part of this memorandum; no sir.

9    Q.  And you didn't do it because you said you didn't feel it

10   applied to you, correct?

11   A.  I believe that's correct.

12   Q.  But the investigators that were on the scene, who told them

13   that they didn't have to keep a log because you were going to

14   seize everything?

15   A.  I believe that was a matter discussed during the specific

16   logistics at the meeting.

17   Q.  Do you recall that specifically or not?

18   A.  No, sir; I don't.

19   Q.  So you are guessing here today that it might have come up or

20   it might not have?

21   A.  Well, again, the determination was made to treat everything

22   seized as privileged or potentially privileged.  In that regard,

23   it just seemed superfluous to do the log.

24   Q.  Would anybody go through and say, "Because it's superfluous,

25   we don't have to give this paragraph?"

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 77 of 171 - Page
ID#: 1037
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Renn

77

1   A.   I -- not that I recall, sir.

2   Q.   Okay.  Now, you mentioned about the investigators going out

3   there.  And Roberta Bottoms, she was on the trial team.  You're

4   aware that she participated in the searches, correct?

5   A.   I -- I'm not, sir.  I don't know.

6   Q.   So as you sit here today, you don't know if Roberta Bottoms

7   went into the law office in Lexington, correct?

8   A.   Not that -- I don't know.

9   Q.   And you don't know if she went into the location down in

10  South Carolina either, right?

11  A.   Not that I know of.

12  Q.   Would that have been against your advice, had one of the

13  members of the trial team gone to one of those locations?

14  A.   It was outlined in the memorandum that that was permissible.

15  Based on the way we structured in bringing in outside agents and

16  stuff, it probably would have been a better practice, I think.

17  Q.   Not to have had her there?

18  A.   Yes.

19  Q.   Okay.  Again, we are talking about rough numbers.  42,000

20  documents, give or take, is what we are talking about here?

21  A.   I'll go with that number.

22           THE COURT:  I want to ask a question, though, because

23  I have heard two things.

24           MR. RENN:  Yes, your Honor.

25           THE COURT:  I have heard "documents" and I have heard

William Samuel Dotson, Cross Examination by Mr. Renn

78

1    "pages."  If I remember the number correctly it was 42,000

2    pages, and Ken Taylor had 1,200 pages, of which 100 documents

3    would be submitted.  Is that right?

4          MR. MARSHALL:  It is 1,000 pages.  The 12,000 figure

5    you're talking about is pages he anticipates using at trial.

6    He has actually received the 39,000 pages.

7          THE COURT:  I understand.  But I'm trying to get a

8    sense of 1,000 documents consist of up to 12,000 pages.  Is

9    that a fair statement?  And I know we're talking in round

10   figures.

11         MR. MARSHALL:  Yes.

12         THE COURT:  Do you agree, Mr. Renn?  Is that what you

13   heard?

14         MR. RENN:  Yes, your Honor.  I apologize.

15         THE COURT:  So we're talking about significantly

16   fewer documents than we are pages; but the 42,000 we have all

17   been working on here today is pages, not documents?

18         MR. RENN:  Thank you, your Honor.  That is correct.

19         THE COURT:  All right.

20   BY MR. RENN:

21   Q.  Again, talking about rough numbers, and as the Court has

22   pointed out, we are talking about pages that you have gone

23   through, either yourself or Ms. Poynter, and said, "In our

24   opinion these are nonprivileged documents."  Is that correct?

25   A.  Yes, sir.

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 79 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1039
William Samuel Dotson, Cross Examination by Mr. Renn

1   Q.  And you were working at your office in London, and of course

2   Ms. Poynter was working at the office here in Lexington?

3   A.  That's correct, sir.

4   Q.  And you were using the IPRO system so you could go back and

5   forth?

6   A.  Yes, sir.

7   Q.  And each of you all were having them tagged under the system

8   that would leave a permanent mark; is that correct?

9   A.  Yes, sir.

10  Q.  And those marks still remain on those documents today?

11  A.  At least electronically; yes, sir.

12  Q.  Okay.  Ms. Poynter is a paralegal, and she too was going

13  through and making a determination whether she considered these

14  documents to be privileged.  That's what your testimony was,

15  correct?

16  A.  She was, sir.

17  Q.  Okay.  Did you all ever get to a point where you all

18  disagreed, or on all these 42,000 pages did you all agree on

19  everything?

20  A.  I don't recall.  I know there were occasions where we

21  conferred with each other about the determination.  I don't --

22  I just can't remember whether or not we actually disagreed on

23  any.  And if there was a disagreement, I would have made the

24  ultimate decision as to a particular document in that regard.

25  Q.  But you would agree it would be unlikely, if you are looking

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 80 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1040
William Samuel Dotson, Cross Examination by Mr. Renn

80

1   at 42,000 pages of documents, that you all would have been

2   agreeable on each one of those 42,000 pages of documents.

3   Correct?

4   A.  I don't know.  I don't know how to answer that.

5   Q.  Did you all ever communicate back and forth by way of memos

6   as to, "These 500 pages I think are privileged.  What do you

7   think?"

8   A.  Not that I can recall.  We may have exchanged e-mails on

9   occasions.  I don't recall any particular memorandums.  I think

10  most of our dialog would have been by telephone.

11  Q.  If you all did communicate by e-mail, did anyone ask you to

12  retain those e-mails?

13  A.  I -- not that I'm aware of, no.  No one asked us to retain

14  any of the e-mails, that I know of.

15  Q.  Do you know if you would still have those e-mails?

16  A.  Possibly.

17  Q.  There wouldn't be any reason for you to delete them,

18  correct?

19  A.  No, sir.

20  Q.  And of course, I'd ask at this time here if you do have any

21  of those that they be retained and not deleted.

22  A.  Yes, sir.

23  Q.  I'm representing Megan Coffman, who is Bryan Coffman's wife.

24  You're aware from the search warrants, I guess, that she was a

25  part of the investigation of this case.  Correct?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Cross Examination by Mr. Renn

81

1   A.  Yes, sir.

2   Q.  Do you know if there were any documents that you recall

3   specifically where her name may have come up?

4   A.  I can't recall specifically today, sir.

5   Q.  But you would have had her name, you would have known that

6   if her name was on those documents that there might be an issue

7   there.  Correct?

8   A.  I was made aware that she was a potential target of the

9   investigation.

10  Q.  Okay.  And some of these other names, whether it was a

11  potential employee, potential client, you didn't have the list

12  of those names.  Correct?

13  A.  Not that I recall.

14  Q.  And then you said that you had made some calls, where there

15  was a confusion as to a name or an entity, that you may have

16  called either Ken Taylor.  Correct?

17  A.  Yes, sir.

18  Q.  Clearly a member of the trial team?

19  A.  Yes, sir.

20  Q.  And/or Roberta Bottoms?

21  A.  Yes, sir; I would have.

22  Q.  Again, a trial team member?

23  A.  Yes, sir.

24  Q.  Do you know if there was any electronic mail, memos, that

25  would have been sent between you and them regarding these

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Cross Examination by Mr. Renn**

82

1   entities out there that you saw from these documents?

2   A.  I don't.  There could have been.  I can't recall

3   specifically, but there could have been.

4   Q.  So if you saw "Patrick Renn," you might contact by

5   electronic mail either Ken Taylor or Roberta Bottoms and say,

6   "Who is this Patrick Renn who is coming up in a lot of these

7   documents?"

8   A.  I may have, sir.

9   Q.  And you may have those stored somewhere?

10  A.  Yes, sir.

11  Q.  I would ask that you maintain those, as well.

12      But up to today, no one has asked you to produce those?  Is

13  that correct?

14  A.  No.

15  Q.  And the taint team, you are talking about yourself, the four

16  persons and yourself?

17  A.  Yes, sir.

18  Q.  And you were the head of the taint team?

19  A.  I suppose that's accurate.

20  Q.  You said, between you and Ms. Poynter, you made the ultimate

21  decision as to what was privileged.  Correct?

22  A.  Yes, I would have.

23  Q.  And Mr. Egnor, the Postal Inspector; as well as Mr. Rea, the

24  attorney.  Is that correct?

25  A.  That's correct.

William Samuel Dotson, Cross Examination by Mr. Renn

83

1   Q.  Did you likewise have authority over them to say, "Look in

2   your green folder, I believe it really should be a yellow or a

3   red?"

4   A.  Would I have had the authority to do that?

5   Q.  Yes.

6   A.  I believe I would have.

7   Q.  Did you go through their green folder yourself?

8   A.  I did not.

9   Q.  So any determination that was made by Mr. Rea or by

10  Mr. Egnor, you just went along with their judgment and didn't do

11  any independent review?

12  A.  Yes, that's correct; yes, sir.

13      MR. RENN:  Nothing further, your Honor.

14      THE WITNESS:  One clarification point.  With regard

15  to the e-mails, I did produce some of those e-mails.  I

16  remember making copies of some of those, and I believe I gave

17  those to Mr. Marshall.  I don't think I did it at his

18  request, I did it on my own accord.  So there are some

19  e-mails that have been provided to Mr. Marshall.  I wanted to

20  clarify that.  I wasn't trying to mislead you or misstate

21  anything.

22  BY MR. RENN:

23  Q.  Do you know when that occurred?

24  A.  It would have been in the last few weeks.

25      MR. RENN:  Thank you, your Honor.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 84 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1044

1    THE COURT:  Mr. Murphy, do you have any questions?

2    MR. MURPHY:  I do, your Honor.

3    CROSS EXAMINATION

4  BY MR. MURPHY:

5  Q.  Mr. Dotson, when you first became a part of the filter team,

6  were you aware of the fact that a person named Gary Milby was

7  also a target of the investigation?

8  A.  Yes, sir; I was.

9  Q.  Do you recall seeing any documents, be it correspondence or

10  otherwise, in these voluminous materials that you went through

11  that were -- that would evidence a relationship between Bryan

12  Coffman and Gary Milby?

13  A.  I believe there were documents related to Mr. Milby in

14  there.  I can't recall the specifics of those.

15  Q.  Were you given a client list by anyone in the Coffman firm,

16  either initially or at some time subsequent?

17  A.  I don't recall being provided with a client list.  There may

18  have been one that was on the materials that were scanned in,

19  but I don't recall specifically being given that client list.

20  Q.  Do you remember ever making the decision with a document, be

21  it correspondence or otherwise, between Bryan Coffman and Gary

22  Milby that you put in the nonprivileged or the green section of

23  files or folders?

24  A.  I don't recall, without seeing a specific document, as far

25  as reading it.

William Samuel Dotson, Cross Examination by Mr. Murphy

85

1    Q.  Were you ever asked to filter documents that had been taken

2    or seized from the law office of an attorney by the name of

3    Hunter Durham, who also represented Mr. Milby?

4    A.  I don't recall that name, sir.

5    Q.  As far as you know, then, all of the documents that you

6    filtered, you and your team, came from seizures made either at

7    Bryan Coffman's law office here in Lexington or his home down in

8    Charleston, South Carolina?

9    A.  As far as I'm aware, sir, yes, that's accurate.

10   Q.  Was there another taint team in place in the U.S. Attorney's

11   Office here in the Eastern District of Kentucky operating

12   independently of you in this case, revolving around this case?

13   A.  Not that I'm aware of.  If there was, I was never made aware

14   of that.

15   Q.  But based on the size of this office and the camaraderie and

16   all, I'm suspecting that that would have been something you

17   would have known that was going on?

18   A.  I don't know.

19   Q.  So if the United States trial team in this case has any

20   documents that they intend to use against Gary Milby in their

21   prosecution that came from the documents seized from Hunter

22   Durham's office, then apparently they have been unfiltered, as

23   far as you know?  They have never been looked at from the taint

24   team standpoint?

25   A.  Unless there was some reason that they would have been in

**William Samuel Dotson, Redirect Examination by Mr. Marshall**

1   the documents that were placed on IPRO, I don't know.

2   Q.  I know -- I know that you looked through obviously literally

3   thousands of pages, but you don't remember ever seeing anything

4   with the name "Hunter Durham," or "The Law Office of Hunter

5   Durham" in there?

6   A.  That name does not stand out to me.

7        MR. MURPHY:  That's all I have, your Honor.

8        THE COURT:  Very well.  Redirect.

9                    REDIRECT EXAMINATION

10  BY MR. MARSHALL:

11  Q.  You were asked about documents you reviewed and specifically

12  names you might remember from those documents.  Mr. Dotson, how

13  long has it been since you reviewed those documents?

14  A.  More than eight months.

15  Q.  You mentioned here a while ago on cross, starting at Page 10

16  of this memorandum which has been the subject of some debate

17  here, I believe Mr. Romines was asking you what you relied on in

18  making your decisions, and you referenced Page 10 and beyond

19  there of the memorandum as things you relied on.

20       Can you just generally review that briefly and describe

21  for the Court in general terms what happens at Page 10 and

22  beyond in that memorandum?

23  A.  In general terms, Page 10 and beyond discuss the

24  attorney-client privilege, the work product privilege.

25  Q.  Does it cite pertinent case law?

**William Samuel Dotson, Redirect Examination by Mr. Marshall**

1  A.  It cites case law that relates to that; what the privilege

2  is, what it is not.  Cases that reflect decisions saying this is

3  not a particular privilege or waiver situation that just

4  doesn't -- doesn't apply.  Things along those lines.

5  Q.  And did you review all that before you started your

6  analysis?

7  A.  I did, sir.

8  Q.  And are you licensed to practice law in the Commonwealth?

9  A.  I am.

10  Q.  How long have you been licensed to practice law in the

11  Commonwealth?

12  A.  Wow, I can't recall when, when I was licensed.  I've been

13  licensed to practice law since around 2003.  I was first

14  practicing in West Virginia and then later took the Bar in

15  Kentucky, I think it was approximately two years after that.

16  Q.  So you have been licensed somewhere since '03?

17  A.  Yes.

18  Q.  If you came across hypothetically here a letter on

19  Mr. Coffman's legal letterhead that talks about a golf game,

20  would that be legally privileged?

21  A.  Not in my determination.

22  Q.  Mr. Romines also -- you all spent some time during his cross

23  on whether anybody had asserted a waiver, anybody had waived a

24  privilege, who can waive a privilege.  Do you recall that?

25  A.  Yes, sir; I do.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Recross Examination by Mr. Romines**

88

1   Q.  Let me ask you:  To your understanding as you conducted your

2   analysis, if between a lawyer and client there is some

3   communication and ten people are carbon copied on that e-mail

4   that are not clients or lawyers, is that, in your estimation, a

5   legally privileged communication?

6   A.  In my determination, it would not be.

7   Q.  Has there been a waiver in that context?

8   A.  I don't even know that it goes to waiver.  I just don't

9   think it would be privileged, to begin with, because it involved

10  a third party.

11  Q.  I think you and I are saying the same things with different

12  terms here.  So if a third party is included inside a

13  communication between a lawyer and a client, what's your

14  understanding?

15  A.  It would be nonprivileged.  It wouldn't amount to -- it

16  doesn't even give rise to a waiver.  A waiver, in my

17  determination, would be something that would occur after the

18  fact.

19          MR. MARSHALL:  Nothing else, your Honor.

20          MR. ROMINES:  Just a couple, your Honor.

21                        RECROSS EXAMINATION

22  BY MR. ROMINES:

23  Q.  But you never let anybody else assist you in that

24  determination, did you?

25  A.  No, sir; I did not.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Recross Examination by Mr. Romines**

89

1  Q.  And starting on Page 10 of the filter team instructions is

2  the attorney-client privilege and all applicable law?

3  A.  Yes, sir.

4  Q.  And who prepared that?

5  A.  I believe Mr. Taylor did.

6  Q.  And you are aware, as a lawyer, that there are multiple

7  interpretations on either side?

8  A.  Yes.

9  Q.  Each side can argue multiple interpretations of the law?

10  A.  Yes, sir.

11  Q.  And there is case law to support that, correct?

12  A.  Yes, sir.

13  Q.  But you just relied on what Mr. Taylor gave you?

14  A.  No, sir; I relied in part on that, and in part of my

15  training and experience.

16  Q.  Okay.  I am handing you a document.  This is going to

17  follow-up on a question that was just asked you.  What does that

18  appear to be?

19  A.  It looks like correspondence between Mr. Coffman, Gary

20  Milby, and Wanda Milby.

21  Q.  Now, Mr. Coffman is the lawyer in this case we're concerned

22  with, correct?

23  A.  Yes, sir; he is.

24  Q.  Gary Milby is also a defendant in this case, correct?

25  A.  I believe that's correct.

**William Samuel Dotson, Recross Examination by Mr. Romines**

90

1  Q.  And you're also aware he was Mr. Coffman's client?

2  A.  Yes.

3  Q.  And were you aware that Wanda Milby was also Mr. Coffman's

4  client?

5  A.  I don't recall, sir.

6  Q.  Now that is clear -- what does that letter concern?

7  A.  It looks like formation documents for a company.

8  Q.  Okay.  Legal advice, isn't it?

9  A.  Well, it could also be viewed as business documents, I

10  believe.

11  Q.  Well, if it was a business document would it be on attorney

12  letterhead, sent to the client?

13  A.  It could be.  I believe it could be, sir.

14  Q.  Okay.  Does it say "Personal and Confidential" on it?

15  A.  It does, sir.

16  Q.  Okay.  How can that be a business document if it's labeled,

17  sent to them directly, and it says "Personal and Confidential"

18  on attorney letterhead?

19  A.  All this references, this letter states that it's enclosing

20  these formation documents, to forward a check back.  Can I read

21  it?

22  Q.  Sure, you can read it.

23  A.  "I've enclosed the final copy of the above-referenced

24  formation documents for your review and execution.  You will

25  need to sign each of the documents as named on the signature

**William Samuel Dotson, Recross Examination by Mr. Romines**

1  page of each.  When you have reviewed and signed them, return

2  them to me at my office.  You will need to forward a check for

3  $200 to register Lone Star-1 LLP with the Kentucky Secretary of

4  State's Office.  Make the check payable to Davis & Coffman,

5  PLLC.  When I receive all these documents back from you and

6  review them for accuracy, I will forward the originals to you in

7  a package containing the documents filed with the Kentucky

8  Secretary of State's office.  I will also notify you of the

9  federal EIN for Lone Star-1 LLP when I obtain it.  If you have

10  any questions for me, please contact me.  I appreciate your

11  prompt attention."

12  Q.  Okay.  This is a letter from Mr. Coffman, correct?

13  A.  Yes, sir.

14  Q.  On attorney letterhead?

15  A.  It is.

16  Q.  To Gary Milby and Wanda Milby, correct?

17  A.  Yes.

18  Q.  Clients?

19  A.  Yes, sir.

20  Q.  And it's regarding documents of a company?

21  A.  Yes, sir.

22  Q.  That he had prepared?

23  A.  Yes, sir.

24  Q.  All right.  How can that not be attorney-client privileged

25  documents?

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 92 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1032
**William Samuel Dotson, Recross Examination by Mr. Romines**

1  A.  To me, it appears to be a forwarded letter containing

2  materials.  I don't -- I would not view that as a communication

3  for the purpose of obtaining legal advice.

4  Q.  And that was the determination you made, and you gave this

5  to the trial team, correct?

6  A.  I don't know if that's one of the documents I gave to the

7  trial team or not.

8  Q.  However, I think we can agree that this would fall under --

9  of your filter team instructions, communications, letters

10  containing a communication between Bryan Coffman and one of his

11  clients, wouldn't it?

12  A.  It would be.

13  Q.  Okay.  And yet, despite the fact that it says it should

14  treat this as privileged, you did not, did you?

15  A.  No, sir; I did not.  If you say that I turned that over,

16  then -- then apparently I did not.

17  Q.  Well, in fact all the documents, all the letters between

18  Bryan Coffman and Mr. Milby or Mr. Tsatskin you turned over to

19  the trial team, didn't you?

20  A.  I don't recall, sir.

21  Q.  Are you aware of any instance in which you did not?

22  A.  I don't recall, sir.  I just don't recall that specifically.

23  Q.  Well, there's only 400 documents that you said were

24  privileged, or that the United States has said were privileged,

25  463.  You can't recall one of those?

**William Samuel Dotson, Recross Examination by Mr. Romines**

93

1  A.  I don't specifically recall, sir.  I don't, as we sit here

2  today.

3  Q.  Now, just one more thing, too.  These e-mails, did you go

4  through any e-mails, or was that Mr. Rea that did that?

5  A.  If they were on the computer, then it would have been

6  Mr. Rea.

7  Q.  Okay.

8  A.  They're -- I can't recall if there were printouts of e-mails

9  in any of the files that went through or not.  There could have

10  been.

11  Q.  Okay.  You last looked at this case eight months ago?

12  A.  Or more.

13  Q.  Okay.  How many of the pages did you go through while you

14  were reviewing -- how long did you have these, a year and a

15  half?

16  A.  Approximately.

17  Q.  All right.  How many of the 49,000 pages -- 42,000, excuse

18  me --

19  A.  I have --

20  Q.  -- did you go through?

21  A.  I have no idea.  There have been quite a few.

22  Q.  Half, 20,000, 5,000?

23  A.  I -- I can't -- I can't tell you.  I don't know a number.

24  Q.  Do you know how many Mr. Bracke went through?

25  A.  I don't, sir.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**William Samuel Dotson, Recross Examination by Mr. Romines**
94

1   Q.  And when did he get the case?

2   A.  He received the case, I believe it was, September of this

3   year.

4   Q.  September of this year?

5   A.  Yes.

6   Q.  So that was what, three months ago?

7   A.  Approximately.

8   Q.  So what was going on in the case in the five months between

9   when you last looked at it and it was given to Mr. Brickey

10  (sic)?

11  A.  Mr. Bracke?  That is when I was of the understanding that

12  the materials had all been turned over to defense counsel and we

13  were waiting on the determination as to what documents

14  specifically were deemed to be privileged so that we could

15  litigate that.

16  Q.  Okay.  And this letter from Bryan Coffman to Gary Milby,

17  that was one that you wouldn't have considered to be privileged?

18  A.  If I turned it over, then that's accurate, sir.

19  Q.  And if I specifically said "This document's not privileged,"

20  you still would have made the determination it was, wouldn't

21  you?

22  A.  If it was in the stack for consideration, to be litigated,

23  I possibly would have argued that with you.

24  Q.  When we were last in court, you indicated that one of the

25  reasons you waited so long was because you were waiting for us

**William Samuel Dotson, Recross Examination by Mr. Romines**

95

 1  to specifically object by page.  Is that right?

 2  A.  That was my understanding, sir.

 3  Q.  When we were last in court, Mr. Taylor indicated a lack of

 4  manpower was one of the problems?

 5  A.  That was one of the problems, as well.

 6  Q.  Which one was it?

 7  A.  It would have been both.

 8  Q.  Did you keep going through them or -- or just wait until I

 9  specifically named the pages?

10  A.  No, we were waiting for the defense to specifically identify

11  pages.  But part of that was -- the lack of manpower played a

12  role in that, as well, because it would have been easier to make

13  those determinations once defense counsel had made a call one

14  way or the other as to whether or not they believed something

15  was privileged.

16  Q.  Well, of 42,000 pages, you only had 400 that were

17  privileged.  It would have actually been just as easy to say

18  they're all not privileged, wouldn't it?

19          THE COURT:  Mr. Romines?

20          MR. ROMINES:  Yes.

21          THE COURT:  I hate to interrupt here.  I understand

22  the case that you are trying to make and the record that you

23  are trying to make, but I have a question for you before we

24  spend the rest of the day doing this.

25      Let me give you an assumption.  I think you're suggesting

**William Samuel Dotson, Recross Examination by Mr. Romines**

96

1  that the sheer number of pages that the government determined

2  were not privileged suggests something nefarious or

3  inappropriate about the process.  Is that your theory?

4       MR. ROMINES:  No, your Honor.

5       THE COURT:  What is your theory?

6       MR. ROMINES:  I actually reviewed the pages, and they

7  cannot be reviewed in good faith and say they are not

8  privileged.

9       THE COURT:  So you are -- what is your theory?  What

10 is your point about this process?

11      MR. ROMINES:  Well, first of all, Judge, as the case

12 law says, you've basically got the fox guarding the henhouse.

13      THE COURT:  That's dicta, that's not the decision.

14      MR. ROMINES:  I understand.  But you have got a U.S.

15 Attorney reviewing the privilege, all right?  And they

16 basically say nothing is privileged.  Well, I've reviewed a

17 lot of the documents in this case.  There -- there is no way

18 an impartial review of these documents could not say they're

19 privileged.

20      THE COURT:  But isn't that my job?  And when are you

21 going to bring those to me?

22      MR. ROMINES:  Well, Judge, as soon as we get the

23 transcript from this hearing I'm going to follow-up with what

24 the trial team has already done.

25    Because, Judge, the issue in this case -- and this is the

**William Samuel Dotson, Recross Examination by Mr. Romines**

97

1   problem.  The issue in this case is not what is admissible.

2   It's the procedure they used.  They just gave the trial team

3   basically everything and said, "Here you go, and we'll fight

4   over it later."  You can't do that.

5          THE COURT:  Well, I'll let you make that argument.  I

6   understand where you're going with this, but you've already

7   made the point.

8          MR. ROMINES:  I agree, Judge.

9          THE COURT:  And your point is, "There are so many

10  documents that you said weren't privileged, you couldn't have

11  given this meaningful review."  And I appreciate and

12  understand that, and we can spend three more hours figuring

13  that one out.

14         MR. ROMINES:  Your Honor, part of my problem is, when

15  I get to cross-examining anybody I don't stop.  But I will

16  not.

17         THE COURT:  And by the way, I don't permit recross,

18  generally, without the permission of the Court, and everyone

19  should be reminded of that.

20         MR. ROMINES:  That's good to know now, Judge.

21  Thank you.

22         THE COURT:  Well, it's generally the procedure of any

23  federal court, I believe.

24     But I understand that you are attacking the process, and

25  we'll talk about what the law requires in a few minutes.  But

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 98 of 171 - Page
ID#: 1038
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
William Samuel Dotson, Recross Examination by Mr. Romines
98

1  is there anything else you want to ask about what happened in

2  the process?

3          MR. ROMINES:  No.

4          THE COURT:  Okay.

5          MR. ROMINES:  And the main thing I wanted out of this

6  witness, Judge, is what sort of standards he used to

7  determine privilege.

8          THE COURT:  All right.  I think we've talked enough

9  about that.  If anybody else wants to talk about that, do it

10 now or forever hold your peace.

11    All right.  Are you finished?

12         MR. ROMINES:  Yes, ma'am.

13         THE COURT:  Okay.  Sir, you may step down.

14         THE WITNESS:  Thank you, your Honor.

15    (Witness leaves the witness stand.)

16         THE COURT:  And everybody, by the way, loves to get

17 to cross-examine an AUSA, so you should feel thoroughly

18 examined.

19         MR. ROMINES:  That's part of it, Judge.

20         THE WITNESS:  Judge, the documents that I have here,

21 do you want me to return them to the Clerk?

22         THE COURT:  Are those the original exhibits,

23 Mr. Marshall?

24         THE WITNESS:  Yes, your Honor.

25         THE COURT:  If you would please hand them to the

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 99 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1039
**Tony Bracke, Direct Examination by Mr. Marshall**

 1    Clerk of the Court, that would be appreciated.

 2        Mr. Marshall, do you have any more witnesses?

 3            MR. MARSHALL:  Judge, as Mr. Dotson said, Mr. Bracke

 4    took over.

 5            THE COURT:  All right.

 6            MR. MARSHALL:  Before we do that, Mr. Dotson comes

 7    from London.  Is he free to go?

 8            MR. ROMINES:  No objection.

 9            THE COURT:  Then, Mr. Dotson, you may head down

10    Interstate 75.

11        (Mr. Dotson leaves the proceeding.)

12            MR. MARSHALL:  The United States calls Tony Bracke.

13            THE COURT:  Is it B-R-A-C-K-E-N?

14            MR. MARSHALL:  B-R-A-C-K-E.  Bracke.

15            THE COURT:  Bracke?  Thank you.

16        (Witness enters the courtroom.)

17            TONY BRACKE, GOVERNMENT'S WITNESS, SWORN

18                    DIRECT EXAMINATION

19    BY MR. MARSHALL:

20    Q.  Sir, please state your name for the record.

21    A.  My name is Tony Bracke, B-R-A-C-K-E.

22    Q.  How are you employed?

23    A.  I'm an Assistant United States Attorney for the Eastern

24    District of Kentucky.

25    Q.  How long have you been employed as an Assistant United

**Tony Bracke, Direct Examination by Mr. Marshall**

1   States Attorney?

2   A.  Since April 3rd of 2005.

3   Q.  How long have you been a licensed attorney?

4   A.  Since November of 199- -- 1988.

5   Q.  And which office within the United States Attorney's Office

6   do you work from?

7   A.  I work in the north branch, which it's called the Covington

8   branch.  Our office is actually located in Fort Mitchell,

9   Kentucky.

10  Q.  At some point, were you asked to take over the filter team

11  responsibilities in relation to United States versus Coffman?

12  A.  Yes, sir.

13  Q.  Roughly when, for the Court, were you asked to take over the

14  filter team?

15  A.  The first conversation about it occurred sometime in the

16  middle of August of 2010.  The first shipment of documents

17  occurred, came to me around on -- on or about August 27th, 2010.

18  Q.  Now, did anyone assist you in the filter analysis there in

19  Fort Mitchell?

20  A.  Well, yes.  First of all, Mandy Poynter is a paralegal in

21  our office, and she had been involved in the filter team and

22  continues to be involved in the filter team.

23      The other person who came on new to the filter team was an

24  attorney in our office named Elaine Leonhard.

25  Q.  And is Ms. Leonhard with us today?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Direct Examination by Mr. Marshall**

1  A.  Ms. Leonhard is on maternity leave.  She gave birth to

2  premature twins on November 8th, 2010.

3  Q.  Mr. Bracke, is it safe to say that you worked closely enough

4  with her to be familiar with her process and the procedures she

5  used in reviewing these documents?

6  A.  Yes.  We met together, went over the process we were going

7  to use, the systems, how we were going to access them through

8  the computer system, what the standards were.  We went over the

9  same material together.  Periodically during the review process

10  we would communicate with each other, saying, "How is it going?

11  What kind of things are you finding?  What do you think about

12  this?"

13      I ultimately wound up kind of not double-checking but

14  going over most of the work that she did in my review, and

15  her evaluations were always consistent with my evaluations.

16  So, yeah, I'm comfortable saying her procedures followed my

17  procedures.

18  Q.  You said you received documents in late August 2010.

19  A.  Yes, sir.

20  Q.  How did you receive those documents?

21  A.  There were -- the big -- the bulk of the documents arrived

22  on August 22, 2010.  They were physically brought up in two

23  vehicles to the Fort Mitchell office.  There were 23 boxes.

24      Of the 23 boxes, there were two that were essentially

25  irrelevant material; it was things like magazines, legal

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 102 of 171 - Page
U.S. v. Coffman, Det al., 5:09-CR-181 (11/17/10)
Tony Bracke, Direct Examination by Mr. Marshall
102

1    publications, blank checkbooks.  I think a call log from the

2    office where somebody calls in and they just write the name and

3    phone number, all the ditto copies, the second page of that.

4        There were two boxes like that.  They weren't sealed, and

5    they were set aside and frankly considered irrelevant

6    throughout.

7        The other 21 boxes; of the other 21 boxes, 20 were

8    sealed.  One of them had been sealed, but the seal had been

9    broken at one point in time by Dave Marye, who was the

10   criminal chief at that time.

11   Q.  Let me stop you right there.  How can you be so sure that

12   Dave Mary, the criminal chief, was the one that broke the seal

13   on that box?

14   A.  Well, several reasons.  One, he told me that he had, that he

15   had opened a box to verify what the shipment was.  Secondly,

16   when I checked, when I ultimately checked and opened that box,

17   inside the box was a sheet of paper that Dave Marye had actually

18   written a note on, saying, "I opened it on such and such a day

19   to verify that it was what I thought it was.  I saw these two

20   folder captions and closed it back up."  That note was in that

21   box.

22   Q.  As far as the criminal chief, was David Marye responsible

23   for those documents coming into your hands?

24   A.  He was, as far as I know, totally responsible for all those

25   boxes coming into my hands.

**Tony Bracke, Direct Examination by Mr. Marshall**

1  Q.  Do you recall or do you know, sitting here today, if David

2  Marye spot-checked any other boxes?

3  A.  No.

4  Q.  So you said out of the 23 boxes you received, 21 were

5  relevant boxes?

6  A.  Correct.  There also was a shipment of -- a FedEx shipment

7  consisting of two boxes; two FedEx boxes, a medium box and small

8  box.  Those boxes did not contain documents, they simply

9  contained disks.  They were scanned copies.  What I was informed

10  is that that was the electronic version of what was in the

11  physical boxes.

12      I didn't open those disks.  My understanding was that

13  they were password protected.  I already had all those things

14  in hard format and they were already scanned into the IPRO

15  system.  I had those two boxes, and they were secured with

16  everything else.

17  Q.  All right.  Let me ask you:  Where did you place all of

18  those items?

19  A.  Those documents were brought and put into an office on the

20  fifth floor of our office space in the pod where my office is.

21  It wasn't my office, it was an office basically adjacent to it.

22  And they were all secured there.

23  Q.  Did you lock the door?

24  A.  I don't believe that door was locked, but it is -- you can't

25  get to the fifth floor without an access card, and you can't get

**Tony Bracke, Direct Examination by Mr. Marshall**

104

1    into the pod without an access card.  I don't believe the

2    individual office door was locked at that time.

3    Q.  As far as you know, did any members of the trial team as you

4    knew it to be constituted have access to the fifth floor of your

5    office?

6    A.  The only person who I guess arguably is considered on the

7    trial team is Wade Napier.  He is a forfeiture lawyer in our

8    office.  He has an access card that gets into the fifth floor

9    and he has access to that pod.

10   Q.  Do you have any reason to believe that Wade Napier ever

11   accessed any of these documents contained in these boxes?

12   A.  I don't believe he could have.  He was -- he was one of the

13   people that carried the boxes upstairs on August 27th, but that

14   was a group effort.  There's only one elevator in our entire

15   building, and everyone -- basically five of us grabbed boxes,

16   loaded up the cart, moved them to the elevator, moved them

17   upstairs, moved them into the room, and came back down and did

18   it again.

19       Mr. Napier is one of the people who specifically handled

20   that.  I don't think he handled the sealed boxes.  Mr. Walbourn

21   that handed that -- I'm sorry, unsealed boxes.  Mr. Walbourn

22   handled that.  Mr. Napier was not alone with any of these

23   documents, and I don't believe he would have had access to them.

24   Q.  Did you keep the boxes in that office?

25   A.  They were stored in that office, along with a box of

**Tony Bracke, Direct Examination by Mr. Marshall**

 1  material that came from -- from Mr. Dotson, of material that had

 2  been pulled off computers by Postal.  That was moved into that

 3  office.  Everything was stored in that particular office from

 4  August 27th until October 8th.

 5      On October 8th, myself and a student in our office moved

 6  everything to another office on the -- it's still on the

 7  fifth floor.  It's in a separate pod that you have to access

 8  through a card.  And we put it in another office space there,

 9  simply because we had -- with the new student starting, we

10  thought he might be operating out of the space where I had

11  stored those things, and I didn't want them stored in the

12  particular room.

13  Q.  Did you lock the second office?

14  A.  When we moved everything up to the second office, I secured

15  the key.  That particular office can only be accessed through

16  two keys.  One of them, I took custody of and kept.  The other

17  one is stored with keys to every room in our office.  There is a

18  lockbox in our computer room that has keys to everything in our

19  office.  But you can't get to the lockbox itself without getting

20  through the computer room, which has a code which is unique to

21  our office.  And frankly, to find which key is in there, there

22  is an indexing system that I'm not sure that anybody but Craig

23  Colgate in our office understands.  He put that index system

24  together.

25      I couldn't locate the other key if I tried.  I doubt anybody

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 106 of 171 - Page
U.S. v. Coffman, Det al., 5:09-CR-181 (11/17/10)
ID#: 906
**Tony Bracke, Direct Examination by Mr. Marshall**

106

1    else other than Mr. Colgate could.

2    Q.  And Mr. Colgate is not part of the trial team?

3    A.  He is not part of the trial team.

4    Q.  When did you unseal the boxes, if ever?

5    A.  We moved the boxes on October 8th.  On October 12th, Mandy

6    Poynter came up.  She and I and Elaine Leonhard got together,

7    kind of went over all the materials that we would use to

8    actually conduct the review.

9        Ms. Leonhard had to leave during that process.  She was on

10   partial bed rest at that particular time.  After Ms. Leonhard

11   left, Mandy Poynter and I opened all the 20 sealed boxes in that

12   office on October 12th of this year.

13   Q.  Did you conduct your filter analysis review through the

14   paper documents?

15   A.  No, we conducted the filter analysis review through the

16   scanned versions of those documents that were in the IPRO

17   system.

18   Q.  Tell the Court, if you will, a little bit how you collated

19   the documents.  What categories did you use, and why?

20   A.  When we began our review of the documents, they essentially

21   were in about roughly eight categories.  They were documents

22   that were marked "Irrelevant."  There were some documents marked

23   "Uncertain."

24   The bulk of the documents were either -- were in one of six

25   different categories marked "Nonprivileged"; there was

1  "Nonprivileged," "Nonprivileged 2," "3," "4," and "5."  And then

2  there was a set of documents marked "Potentially Privileged."

3  And then there were many, many, many unmarked documents.

4  Q.  Documents that hadn't yet been reviewed?

5  A.  Yes.

6  Q.  All right.  Let's -- I want to ask you about the

7  "Nonprivileged 1," "2," "3," "4," and "5."  Did you have any

8  understanding about why there were different sets of those?  How

9  did that come to be?

10  A.  Yes.  My understanding was that the -- the initial review

11  that was done in this particular matter was done by Ms. Poynter,

12  who was a paralegal, and she simply got through all the

13  documents in six sessions.  It took her six sessions.

14       And so, as she went through documents she moved -- she

15  would tab the initial page of the document either in not --

16  if she didn't think it was privileged, she would put it in

17  either "Nonprivileged" -- the first day she would put it in

18  "Nonprivileged" or "Potentially Privileged."  The second

19  session she would put it in either "Nonprivileged 2" or

20  "Potentially Privileged."

21  Q.  All right.

22  A.  She continued to do that all the way until she finished her

23  review.  That's where "Nonprivileged" and "Nonprivileged 1"

24  through "5," those six categories came up.

25  Q.  What privilege did you review?

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 108 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1008
Tony Bracke, Direct Examination by Mr. Marshall
108

1  A.  What happened there is Mr. Dotson did the review of

2  "Nonprivileged" and "Nonprivileged 2."  Ms. Leonhard and I knew

3  that we were going to be doing this review from two different

4  locations, and we were hoping we could work on it

5  simultaneously, and wanted to make sure we covered every

6  document.  What we did is, we essentially created three tags --

7  three tags.  One was "Attorney Review," "Nonprivileged," or

8  "Attorney Review NP," which is the green tag, things that are

9  going to be disclosed.

10     The second category was "Attorney Reviewed Exception,"

11  which was the yellow category, things that we felt needed to

12  be reviewed by the defense team before being -- for a

13  determination, along with our determination.  And then

14  "Attorney Review Privileged," which was the red category that

15  was never going to be disclosed.  We created those tags.

16  Q.  When you created those tags, was it your understanding that

17  the method was consistent with the method that was used before

18  you?

19  A.  It was consistent, except what it did is, Mr. Dotson's

20  review of going through "Nonprivileged" and "Nonprivileged 2,"

21  what he did is if he thought it was nonprivileged it simply

22  stayed in there.  And if he felt it needed to be moved to a

23  potentially privileged site, he moved it to a potentially

24  privileged category.

25     The reason I didn't continue to follow that is that I

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 109 of 171 - Page
U.S. v. Coffman, et al., ID#: 1009, 5:09-CR-181 (11/17/10)
Tony Bracke, Direct Examination by Mr. Marshall
109

1  felt we might be duplicating one another's efforts.  So what

2  Ms. Leonhard and I decided we would do is go through all the

3  remaining categories:  "Nonprivileged 3," "4," "5," and "6,"

4  "Uncertain," and "Potentially Privileged."  And we were going

5  to clear those out.  We were not going to leave anything in

6  those categories.  We were going to move every document in

7  the original categories into one of the categories we

8  created.  Therefore, by emptying them out, we would know how

9  far we got, what was left, and be sure we were not

10  duplicating each other's efforts.

11     Other than moving the tags, it's the same thing; it's

12  just a different way of documenting our work.

13  Q.  So to be clear, the categories essentially were privileged,

14  nonprivileged, and a category for potentially privileged, maybe

15  an example of what we called yellow?

16  A.  Absolutely.

17  Q.  I believe your testimony is, and I want to make sure I

18  understand it, is that of the numbered batches that you

19  inherited from the prior team, it was your understanding that

20  Mr. Dotson reviewed 1 and 2 and you and Ms. Leonhard reviewed 3

21  and the rest?

22  A.  Exactly.

23  Q.  When did you complete the analysis, roughly?

24  A.  Our analysis finished on November 10th.

25  Q.  Are you aware that on the same date that Ms. Poynter made a

**Tony Bracke, Direct Examination by Mr. Marshall**

1  disclosure of green documents to the trial team?

2  A.  Yes.  As a matter of fact, I looked at the last of the pages

3  late in the evening on November 9.  On the 10th of November, we

4  came in and did the clean-up, went through the different

5  categories and made sure they were all empty, went through the

6  yellow and the red to make sure everything was consistent, that

7  there were no inconsistencies, just generally cleaned up.  That

8  took some time in the morning.

9      The morning of the 10th, I then sent an e-mail to

10 Ms. Poynter saying, "All right, I'm done.  Please

11 double-check and review anything, make sure there's nothing

12 untagged that needs to be reviewed.  But everything in green

13 is good to go.  It can be disclosed."

14 Q.  Did she double-check, as you asked?

15 A.  She did.  As a matter of fact, she caught one page that I

16 had that was in the middle of the document, and the tags were

17 all next to each other.  There was one page in the document that

18 I had marked yellow, and I just hit the wrong box.  She said,

19 "Would you go check this page and see what you think?  I

20 couldn't figure out why this is yellow and not green.  If you

21 think it is, that's what it is."

22     So I went back and looked at the document and looked at

23 the pages, and I realized I simply tagged it wrong.  So yes,

24 she did check.

25 Q.  So there was a process of double-checking?

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 111 of 171 - Page
ID#: 1071
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Direct Examination by Mr. Marshall

1  A.  Yes.

2  Q.  Do you recall receiving word that the criminal chief had

3  approved the disclosure of the remaining green to the trial

4  team?

5  A.  Yes, because that was when I sent my initial e-mail saying

6  I was done.  And on November 10th I said, "Are we disclosing the

7  green at this point in time, or are we going to wait for the

8  hearing?"  At one point in time there was a question about which

9  way we're going to go.  I got word back that the criminal chief

10  had authorized disclosure of the green documents, the documents

11  not privileged.  On the 10th, I told Ms. Poynter to go ahead and

12  put it on the disk and get it to the trial team.

13        MR. MARSHALL:  Your Honor, with your permission I

14  would like to show defense counsel the three remaining

15  exhibits.

16        THE COURT:  You may.

17     (Mr. Marshall and Mr. Romines confer.)

18        MR. MARSHALL:  Your Honor, if the Court please, I

19  would ask that Government's Exhibit 8 and 9 be provided to

20  the witness.

21        THE COURT:  Exhibits 8 and 9 may be provided to the

22  witness.  Thank you.

23  BY MR. MARSHALL:

24  Q.  Mr. Bracke, please take a second, pop those disks out of the

25  sleeve if you need to, and take a look at them.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Direct Examination by Mr. Marshall

112

1   A.  I see them.

2   Q.  Do you recognize Government's Exhibit 8?

3   A.  Exhibit 8, yes.  Exhibit 8 is the disk that was created by

4   Ms. Poynter on the 10th of November of green documents that was

5   disclosed to the trial team on November 10th.

6   Q.  Now, did Ms. Poynter discover a glitch in the documents

7   handed over to the trial team at that time?

8   A.  It's my understanding that in the process of building this

9   disk that there was a section that was duplicated and that there

10  was something that was omitted.  As a result of that -- of the

11  green documents.  As a result of that, she had to create a

12  second disk, which is Government's Exhibit 9, that contained the

13  omitted material.  And that was disclosed on November 15th.

14  Q.  Let me make sure I understand you on that.  So when she

15  built the disk the first time, some part of the green was

16  omitted and another part of the green was in its place?

17  A.  That's my understanding; yes, sir.

18  Q.  She redid the project, putting in the green that had been

19  omitted?

20  A.  That's my understanding, and that's contained in Exhibit 9.

21  Q.  Did any of that disclosure glitch, as I refer to it, involve

22  yellow or red documents?

23  A.  No.  Yellow or red, to the best of my knowledge, were

24  completely separate and not put on a disk.  They were still

25  marked, had not been disclosed.  They were not part of any

1  disclosure, any prior disclosure, in Government's Exhibit 8

2  or 9.

3  Q.  As you review Government's Exhibit 9, when was it disclosed

4  to the trial team as redone?

5  A.  November 15th.

6       MR. MARSHALL:  Your Honor, I will ask that the

7  witness be shown Government's Exhibit 10.

8       THE COURT:  He may.

9  BY MR. MARSHALL:

10  Q.  Now, Mr. Bracke, you mentioned that you also received as you

11  took over the filter team some Postal documents that came from

12  Mr. Dotson.

13  A.  Yes.  Initially there was a shipment of one box of documents

14  shipped to me from Mr. Dotson that was sealed.  We got it, we

15  secured it with all the other boxes.

16       On October 12th, when Ms. Poynter and I were going

17  through the documents and opening all the boxes to try to

18  figure out what boxes corresponded to what entries in IPRO,

19  things of that nature, we went through the Postal documents,

20  and it appeared that they were incomplete.  The documents

21  themselves, there was a letter explaining this was

22  essentially a second shipment of documents and that there had

23  been a prior shipment.

24  Q.  Who prepared those documents?  Who reviewed them?

25  A.  Those documents were reviewed by an attorney for the U.S.

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 114 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1074
**Tony Bracke, Direct Examination by Mr. Marshall**

114

1  Postal Service, I believe his last name is Rea.  R-E-A, I

2  believe.

3  Q.  Okay.

4  A.  As a result of seeing that there were documents that seemed

5  to be missing, I called Sam, sent him an e-mail -- probably did

6  both, frankly, because I was a little worried about where this

7  box was.  Asked him to double-check and see if this other box

8  should be around there.  I had a general idea what it should

9  look like, that it was smaller than the other boxes that came

10  from Postal.

11  Q.  Did he send it to you?

12  A.  Yes, he did.  About 7 or 8 days later I got it from Sam.  It

13  was sealed and secured at that time.

14  Q.  Did this box contain documents that had been reviewed by

15  Mr. Rea?

16  A.  Yes.

17  Q.  All right.  Had he categorized the documents?

18  A.  Yes.  Both boxes of material that Mr. Rea had reviewed had

19  been categorized, the hard copies had been categorized; they had

20  literally been clipped together, red, yellow, and green.  And

21  both boxes were like what.

22  Q.  Did you ever take steps to disclose the red or yellow

23  documents from those boxes to the trial team?

24  A.  No, I made sure that all those things -- all those things

25  were locked away and secured in the same room as the other

1    boxes.  And Ms. Poynter, I instructed here to ultimately scan

2    the green documents and disclose them, but not the yellow or the

3    red.  To my knowledge, they were hard copies and it's never been

4    disclosed.

5    Q.  Does that disk in your hand representing Exhibit 10

6    represent that scanned green documents?

7    A.  Yes, that was created by Ms. Poynter yesterday by scanning

8    the green documents, and those documents were written to the

9    disk and its contents were disclosed yesterday on November 16,

10   2010.

11   Q.  So that disk memorializes the final disclosure to the trial

12   team?

13   A.  From the Postal Service, yes.

14        MR. MARSHALL:  Your Honor, I would move to admit

15   Government's Exhibits 8, 9, and 10, under seal.

16        MR. ROMINES:  No objection.

17        THE COURT:  You may.

18     (Government's Exhibit Nos. 8, 9, and 10 were admitted into

19   evidence.)

20   BY MR. MARSHALL:

21   Q.  All right.  Mr. Bracke, just a few more.  Over the course of

22   your involvement with the Coffman filter analysis, did you ever

23   provide any yellow or red documents to any member of the trial

24   team?

25   A.  Absolutely not.

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 116 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1076
**Tony Bracke, Direct Examination by Mr. Marshall**

116

1   Q.  To the best of your knowledge, did any other member of the

2   filter team ever give any member of the trial team any yellow or

3   red documents?

4   A.  No.

5   Q.  For as long as you were part of the filter team, did any

6   documents go to the trial team without your prior knowledge or

7   specific approval?

8   A.  No.  The only documents that were released from the time of

9   my involvement on were the documents contained in these three

10  disks -- Government's Exhibits 8, 9, and 10 -- and I authorized

11  those things to be disclosed.

12  Q.  Did any member of the trial team ever ask you or pressure

13  you to show them or tell them about the contents of any yellow

14  or red documents?

15  A.  They have never asked me about the contents of any

16  documents.  They have never pressured me about anything.

17  Q.  As far as you know, by either intentional act or mistake,

18  has any member of the trial team seen even one page of any red

19  or yellow document?

20  A.  I don't think that's possible.

21  Q.  Has any trial team member been told even one iota of any of

22  the information contained in the red or yellow documents?

23  A.  Absolutely not.

24      MR. MARSHALL:  Your Honor, that's all I have of the

25  witness.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 117 of 171 - Page
ID#: 1977
U.S. v. Coffman, et al, 5:09-CR-181 (11/17/10)
Tony Bracke, Cross Examination by Mr. Romines

1    THE COURT:  Very well.  Mr. Romines?

2    MR. ROMINES:  Thank you, your Honor.

3                    CROSS EXAMINATION

4    BY MR. ROMINES:

5    Q.  Mr. Bracke, my name is Steven Romines.  If I ask you

6    anything you don't understand, ask me to rephrase.  Okay?

7    A.  Yes, sir.

8    Q.  You received 23 boxes on approximately 8/27; is that

9    correct?

10   A.  Yes.

11   Q.  When did you first look at those boxes?

12   A.  The first time I looked at the boxes was on August -- I'm

13   sorry, the 23 boxes that came on October 20 -- on August 27th?

14   Q.  Yes.

15   A.  The first time I looked at them, at the contents of any of

16   them, was on October 12th.

17   Q.  Okay.  What, a month and-a-half later?

18   A.  Yes, sir.

19   Q.  Why the delay?

20   A.  I needed -- I felt like I needed to get instructions from --

21   first of all, I just got the boxes.  I didn't have the search

22   warrant that the boxes were seized under.  I didn't have the

23   procedures that had been used by the prior taint team.  I didn't

24   have information as to exactly how far the prior taint team had

25   gotten and where they left off and what the setup was.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 118 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1073
Tony Bracke, Cross Examination by Mr. Romines

1    Basically, in order to do it I needed instructions, I

2  needed information as to where those things -- what had

3  already been done, how things were categorized.

4    I didn't ultimately get that information until October

5  12th.

6  Q.  Had you been -- were you provided at any time the briefs and

7  motions that had been filed in the course of this litigation

8  concerning these documents?

9  A.  Sometime between October 8th and October 12th I got that

10 packet of information, what I was looking for.  I got the brief.

11 I got the motion that had been filed, I believe by yourself,

12 regarding whether there should be a filter team at all.  I got

13 the government's response.  I got the indictment.  I got the

14 search warrant.  I got the authorization to search an attorney's

15 office.  And I got the instructions to -- given to the filter

16 team.  I got those somewhere around that -- somewhere in that

17 time frame, October 8th to October 12th.

18 Q.  Okay.  So you were aware when you -- in October, when you

19 first looked at these documents, that whether these items were

20 privileged or not was currently subject to litigation, weren't

21 you?

22 A.  Yes, sir.

23 Q.  Okay.  How many -- how many pages did you review?

24 A.  The material in IPRO was 37,015 pages.  I can't say exactly,

25 an exact number of how many I reviewed.  I believe I reviewed

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 119 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1070
Tony Bracke, Cross Examination by Mr. Romines
119

1   probably around 20,000 to 22,000 pages.

2   Q.  How many pages -- and you may have answered this, but I'll

3   ask it.  How many pages had been reviewed when you received them

4   in August?

5   A.  It's my understanding that Mr. Dotson's review constituted

6   about 17,000 pages.  There was a little bit of overlap, but

7   pretty minimal.  The overlap was in documents that Mr. Dotson

8   had labeled as potentially privileged.  I had no idea of knowing

9   how many of those documents were there because Mr. Dotson put

10  them there or were there because Ms. Poynter put them there, so

11  I went through all those documents, page by page.

12       That's why I'm saying there was a general range.  My

13  understanding is that Mr. Dotson did about 17,000 pages.  Myself

14  with Ms. Leonhard's significant assistance, we did about the

15  other 20.

16  Q.  Were there any documents that Ms. Leonhard specifically

17  reviewed herself that you did not review?

18  A.  The only documents that Ms. Leonhard could have reviewed

19  that I did not review would have been documents that she marked

20  as privileged documents and put in the privileged category.  If

21  she put that in the privileged category, I didn't double-check

22  that or look at that again.

23       Anything that she put in the yellow category, I went through

24  just in the course of getting the yellow category ready to go.

25  Everything that she put in the green category I ultimately ended

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Cross Examination by Mr. Romines

120

1    up having to review, again because when she did her review,

2    based on a misunderstanding, she was looking at the first page

3    of each document and not the subsequent pages of the document.

4    We found out that was going on, so therefore I basically had to

5    go back and look at all of the pages of the documents.

6    Q.  How many -- of the 17,000 pages that were reviewed prior to

7    them being delivered to you, how many of those were reviewed by

8    Ms. Poynter only?

9    A.  I don't believe any of them were only reviewed by

10   Ms. Poynter.  I believe that Mr. Dotson reviewed -- I want to

11   say everything Ms. Poynter had reviewed, Mr. Dotson reviewed or

12   I reviewed.

13   Q.  Okay.  How do you know that?

14   A.  The -- my understanding was Ms. Poynter went through

15   everything, all 37,000 pages.

16   Q.  Um-hum.

17   A.  Mr. Dotson went through the documents that were contained in

18   "Nonprivileged" and "Nonprivileged 2."  And I know that because

19   Mr. Dotson told me that.

20   Q.  Okay.

21   A.  The remaining documents, everything that was not in

22   "Nonprivileged" or "Nonprivileged 2," either myself or

23   Ms. Leonhard reviewed.

24   Q.  Okay.  Well, Mr. Dotson just testified that some documents

25   Ms. Poynter reviewed on her own, so --

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 121 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1091
Tony Bracke, Cross Examination by Mr. Romines
121

1   A.   There were some documents that Ms. Poynter could have put in

2   the Potentially Privileged -- the Potentially Privileged

3   category.

4   Q.   Did you review those again?

5   A.   Oh, yes, I did.  I reviewed every -- if Ms. Poynter had put

6   something in Potentially Privileged, Mr. Dotson didn't bother

7   going through that and look at the documents, but I did that

8   part of it.

9   Q.   The review of the 17,000 pages that you received that had

10  already been reviewed, did you redo that?

11  A.   Only the portion that was in Potentially Privileged.

12  Q.   So the items that were marked as Nonprivileged, you didn't

13  review?

14  A.   That's correct.

15  Q.   All right.  Now, what I want to talk about is, what

16  guidelines did you use for determining what's privileged?

17  A.   The guidelines that I used, there was a memorandum put

18  together by the -- it was signed off by the U.S. Attorney, and I

19  think somebody in Washington signed off on it, as well -- that

20  outlined -- basically, I used the attorney-client privilege and

21  the memorandum.

22  Q.   Government's Exhibit 3, does that appear to be it?

23  A.   Yes, sir.

24  Q.   Okay.  I'll hand you the actual exhibit copy.

25  A.   Yes, sir.

1  Q.  Is this the extent of what you relied on to determine what

2  was privileged?

3  A.  I don't think it's fair to say that, because I have

4  knowledge about the attorney-client privilege that's not

5  contained in this particular document.

6  Q.  All right.  In your -- based on your knowledge, what would

7  make an item privileged?

8  A.  An item would be privileged if it were communications from a

9  client to an attorney that were intended to be a secret, that

10  was not disclosed to an outside source, that was offered in the

11  course of seeking legal representation or providing -- provision

12  of legal services.  Work product of the attorney that was

13  generated in anticipation of litigation, some sort of court

14  action, would be privileged as well.

15      There are exceptions and things like that, but I guess

16  that's an overall definition.

17  Q.  Would it also include communication from an attorney to a

18  client?

19  A.  Oh, yes, sir; definitely.

20  Q.  Did you all consider communications being letters or e-mails

21  between attorney and client to be privileged?

22  A.  Private communications regarding legal representation

23  between attorney and client, in either direction, we would have

24  considered that to be privileged.

25  Q.  Okay.  And how would you determine what was not privileged?

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Romines**

1  A.  If it didn't fit the category of privileged, it was not

2  privileged.

3  Q.  Okay.  Well -- I'll show you this.

4     What does that appear to be?

5  A.  It is a letter to Gary Milby and Wanda Milby from Bryan

6  Coffman.

7  Q.  Now, you are aware, or were you made aware, that Gary Milby

8  and Wanda Milby were Bryan Coffman's clients?

9  A.  Yes, sir.

10  Q.  Okay.  So that is a letter from an attorney to clients,

11  correct?

12  A.  Yes, sir.

13  Q.  All right.  Marked "Personal and Confidential," correct?

14  A.  That's what's typed at the top; yes, sir.

15  Q.  Okay.  Is that privileged, based on your evaluation?

16     (Witness reviews document.)

17     MR. ROMINES:  Your Honor, I'm going to label that as

18  Defendant's Exhibit 1.  I referred to it with --

19     THE COURT:  Is this the same document you used with

20  respect to Mr. Catron -- or Mr. Dotson, rather?

21     MR. ROMINES:  I'll show them.  Yes.

22     THE COURT:  Any objection, Mr. Marshall?

23     MR. MARSHALL:  I haven't seen it, but I don't object

24  to it.

25     THE COURT:  All right.  Defense 1.  You may mark it.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Cross Examination by Mr. Romines

1    It will be admitted.

2        (Defendants' Exhibit No. 1 was admitted into evidence.)

3        THE WITNESS:  I believe there are -- it looks that

4    there are portions of that that would be privileged.

5    BY MR. ROMINES:

6    Q.   Okay.  And why would that be?

7    A.   There are -- in the second page there are some basically

8    seeking "How do you want me to proceed in handling these

9    particular matters?"  I think -- I would think that would fit

10   into that area.

11   Q.   Okay.  Now, if there's portions of a document that are

12   privileged, the whole thing would be privileged, correct?

13   A.   That would be how I would mark it.

14   Q.   Okay.  What about e-mails between -- e-mails between an

15   attorney and client?

16   A.   E-mails between an attorney and client are certainly

17   communications between them.  If they were private and

18   conducted -- dealt with the representation and provision of

19   legal advice and instructions, then they would be privileged.

20   If they related to something else, then they wouldn't.

21   Q.   Of course, if they are dirty e-mails or something like that,

22   they wouldn't be.  But if it's about, you know, the course of

23   any representation it would be, wouldn't it?

24   A.   If it's about a private matter in the course of the

25   representation concerning legal advice, then it would be.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 125 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1035
Tony Bracke, Cross Examination by Mr. Romines

1   Q.   Okay.  Did you all have any guidance, any written

2   guidelines, other than Government's Exhibit 3, as to how to

3   determine what's privileged and what's not?

4   A.   There was nothing else in writing.  No, sir; not in writing.

5   Q.   So just best -- do your best?

6   A.   Do your best, based upon your knowledge and experience.

7   Q.   Okay.  Did you ever submit a single document to a special

8   master?

9   A.   No, sir.

10  Q.   Did you ever submit a single document to a judicial officer

11  of any type?

12  A.   We hadn't gotten to that stage.

13  Q.   Did you ever contact me to get my opinion on whether a

14  document was privileged or not?

15  A.   We had not gotten to that stage.

16  Q.   Okay.  Look at your....

17       Does that document -- actually, just to speed up time.

18  That's yours.  Hold on.

19       Turn to Page 9.

20  A.   Yes, sir.

21  Q.   Top of the page.  "The filter team AUSA will furnish the

22  privilege holder a list of potentially privileged material."

23  A.   Yes, sir.

24  Q.   Did you ever do that?

25  A.   We have not done that.  The yellow -- those would be the

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Romines**

126

1  yellow documents that we -- well, that would be yellow and red,

2  frankly, and we hadn't -- all we had gotten to was complete the

3  review, we had gotten the green documents disclosed.  The next

4  step would be to contact you and say, "What arrangements do you

5  want to make to pick up the red documents?  And here are the

6  yellow documents.  I want you to review them."  We haven't

7  gotten to that point yet.

8  Q.  If I don't agree that the documents that you have already

9  given to the trial team, you say they are not privileged and I

10  say they are, what is your remedy?

11  A.  Your remedy is to go to the Court about them.

12  Q.  But they have already seen them, correct?

13  A.  Yes, sir.

14  Q.  In fact, Exhibits 8, 9, and 10 that you were just asked

15  about?

16  A.  Yes, sir.

17  Q.  Those were given to the trial team last week, correct?

18  A.  One was last week and the other two were this week.

19  Q.  And these were given to the trial team after you were aware

20  that we were objecting to all these documents as being

21  privileged.  Correct?

22  A.  Yes, sir.

23  Q.  And this matter was in litigation with a hearing today?

24  A.  Yes, sir.

25  Q.  All right.  And yet, you just gave them to them anyway?

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 127 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1897
**Tony Bracke, Cross Examination by Mr. Renn**

127

1   A.  That was the reason that I had asked for the instructions

2   from the criminal chief regarding whether we were to hold on to

3   the green documents or whether to go ahead and disclose them.

4   The instructions I got back were to go ahead and disclose them,

5   so we did.

6   Q.  Don't let the Judge rule on them?

7   A.  We went ahead and disclosed them prior to this hearing.

8   Q.  And again, other than this document, you had no written

9   guidance as to what was privileged and what wasn't?

10  A.  That was given to me by the office.  I had material about

11  attorney-client privilege.  I've got a textbook on it and things

12  like that, but nothing that I specifically consulted.

13  Q.  Is there anything that you relied on?

14  A.  No, sir.

15       MR. ROMINES:  That's all I have, your Honor.

16       THE COURT:  Mr. Renn?

17       MR. RENN:  Yes, your Honor.  Thank you.

18                    CROSS EXAMINATION

19  BY MR. RENN:

20  Q.  You just said, I believe, Mr. Bracke, that you received

21  instructions on whether to go ahead and release these documents

22  from the division chief, correct?

23  A.  Criminal chief.

24  Q.  I'm sorry, criminal chief.  That was David Marye, correct?

25  A.  No, Kevin Dicken is the criminal chief at this point in

1    time.  My question went out on November 10th, saying, "I have

2    done my review.  I've gotten everything categorized as green,

3    yellow, red.  How should we proceed with the green?  Should we

4    disclose them or should we withhold them for the hearing?"

5        The instructions I got back -- they weren't from Mr. Dicken,

6    but they were related to me as Mr. Dicken's instruction was to

7    go ahead and disclose them.

8    Q.  You are on the taint team?

9    A.  Correct.

10   Q.  You are the head of the taint team?

11   A.  Yes, sir.

12   Q.  But you are taking instruction from somebody here at the

13   office where this case is pending, correct?

14   A.  I took instructions from the criminal chief regarding when

15   to make the disclosure of documents that I had already

16   classified.  I didn't get instructions as to how to classify any

17   documents.

18   Q.  I understand.  And again, Mr. Romines was just asking you

19   about disclosure of those documents, Government's Exhibit 8, 9,

20   and 10, correct?

21   A.  The decision to disclose these documents prior to the

22   hearing, I did seek guidance from the criminal chief and acted

23   in accordance with that guidance.

24   Q.  And again, you are the one that's supposed to be in charge

25   of the taint team, correct?

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 129 of 171 - Page
ID#: 1839
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Cross Examination by Mr. Renn
129

1   A.  Yes, sir.

2   Q.  And the purpose of the taint team is to take it outside of

3   this office so that someone outside of the office here in

4   Lexington office makes the decision, correct?

5   A.  I think it's correct to say the taint team is to take it out

6   of the prosecution team.  I don't think the taint team operates

7   independently of the office as a whole.  It operates independent

8   of the prosecution team, however.

9   Q.  But you got all these documents, I think you said, in August

10  2010, correct?

11  A.  Yes, sir.

12  Q.  And then you waited for some instructions again, and that's

13  when you started your review on the other documents on October

14  12, 2010?

15  A.  I waited for the instructions that had already been put in

16  place at the beginning of this process.  I just wanted -- I

17  wanted copies of it so I would know what it said; yes, sir.

18  Q.  Because you wanted to make sure you were following proper

19  instruction, correct?

20  A.  Well, sure, and I didn't want to duplicate efforts, as well.

21  Q.  And one of the instructions was a memorandum that came from

22  the Court basically saying this is what you should do and this

23  is how you ought to do it.  That's the instruction in Exhibit 3,

24  correct?

25  A.  I don't think it is a document from the Court itself, but it

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Renn**

130

1   is a document that was prepared at the beginning of the search

2   process regarding how it was supposed to be handled again.

3   Q.  But again, you, as the head of the taint team, you wanted to

4   have that before you started any of your work.  Correct?

5   A.  Oh, absolutely.

6   Q.  Again, independent of this office here in Lexington?

7   A.  I'm not -- I'm not sure I understand what you mean by "this

8   office."

9   Q.  This office.  There was a point being made you were from the

10  office up in northern Kentucky, whether it was Covington or Fort

11  Mitchell, correct?

12  A.  They are not really different offices, they're different

13  branches of the same office; yes, sir.

14  Q.  But again, not here in Lexington where the case is pending?

15  A.  That's correct, I continued to be stationed in the north

16  branch; yes, sir.

17  Q.  Mr. Dotson, who previously had the case, he was in the

18  branch down in London.  Correct?

19  A.  Yes, sir.

20  Q.  Again, separate and apart from Lexington?

21  A.  Physically, yes.

22  Q.  So you physically, up in northern Kentucky, wanted to make

23  sure you had your instructions so you could do your job,

24  correct?

25  A.  Yes, sir.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Renn**

131

1  Q.  Separate from what may have been going on down here in

2  Lexington, correct?

3  A.  Separate from anything involved in the prosecution, yes.

4  Q.  And then while this case is pending, you get a call or get a

5  message from somebody saying that the division chief, who is

6  here in the courtroom today, told you to go ahead and disclose

7  those documents?

8  A.  The green documents; yes, sir.

9  Q.  Now, you indicated there were about 37,000 pages of

10  documents, correct?

11  A.  37,015 pages were in the -- were contained in the initial 21

12  boxes.  There were another 5,000 documents or so that were

13  reviewed by Postal.  But what I was responsible for primarily

14  reviewing was the 37,015 pages.

15  Q.  And you, yourself, went through all those, correct?

16  A.  I went through the ones that had not been reviewed, like I

17  said, by Mr. Dotson.  I went through 20,000 or 22,000 or so.

18  Q.  And you were able to do that basically in about a month's

19  time, correct?

20  A.  Ms. Leonhard and I were able to do it in about a month's

21  time.  It would be unfair to say it was just me.

22  Q.  Your taint team at that time included you, Assistant U.S.

23  Attorney Ms. Leonhard, and Ms. Poynter.  Correct?

24  A.  That's correct.

25  Q.  So basically, in one month's time you were able to go

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 132 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
Tony Bracke, Cross Examination by Mr. Renn
132

1  through 22,000 documents?

2  A.  Yes, sir.

3  Q.  And Mr. Dotson, who had previously been involved with his

4  taint team, and Ms. Poynter, had only gone through 17,000 in a

5  previous amount of time.  Correct?

6  A.  That's my understanding.

7  Q.  Now, you said you were looking for a particular name.  Did

8  you have a list of clients for Mr. Coffman and what names might

9  be important, such as clients of his?

10  A.  What I had was the list of the attorneys for Mr. Coffman.

11  I had the pleading identifying Mr. Romines as counsel for

12  Mr. Coffman.  I think at some point in time I asked Ms. Poynter

13  to determine whether or not there were any other cocounsel for

14  Mr. -- for Mr. Coffman, and the feedback I got was no, it was

15  just Mr. Romines.

16      Also, I knew who the other indicted parties were in the

17  matter from the copy of the indictment, so I had that

18  information.  That's the information I had as to clients of

19  Mr. Coffman's and attorneys of Mr. Coffman.

20  Q.  So no one provided you with a list?

21  A.  No, nobody provided me with a client list of Mr. Coffman's.

22  Q.  Other than what you are saying?

23      Okay.  Obviously the other potential targets were other

24  indicted persons, and that would include Ms. Coffman,

25  correct?

U.S. v. Coffman, et al, 5:09-CR-181 (11/17/10)

**Tony Bracke, Cross Examination by Mr. Renn**

1  A.  That's correct.

2  Q.  You reviewed that in the past month, correct?

3  A.  Yes.

4  Q.  Do you recall seeing anything related to Megan Coffman?

5  A.  I recall seeing her name a few times, but not very often.

6  Q.  And like Mr. Romines, you never contacted me, correct?

7  A.  No, sir.

8  Q.  Were any of those documents placed in Privileged or

9  Nonprivileged?  Do you recall how those would have been

10  categorized?

11  A.  I can't answer that question.  The bulk of the documents

12  were classified as not privileged, I believe 29,000 or so

13  nonprivileged.  The remaining documents were classified as

14  either -- I think, of the remaining documents, slightly under

15  2,500 were classified as yellow and slightly under 500 were

16  classified as privileged.  I can't tell you where the documents

17  that had Ms. Coffman's name on it wound up.

18  Q.  The memorandum that you were talking about here a few

19  minutes ago, Government's Exhibit No. 3; again, you waited to

20  receive that before you started your work.  Correct?

21  A.  I waited to begin my work until I received it; yes, that's a

22  fair statement.

23  Q.  And when you received it, you recognized that it applied to

24  you.  Correct?

25  A.  Oh, yes, sir.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Murphy**

134

1        MR. RENN:  Nothing further, your Honor.

2        THE COURT:  Thank you.  Mr. Murphy?

3        MR. MURPHY:  Thank you, your Honor.

4                    CROSS EXAMINATION

5   BY MR. MURPHY:

6   Q.  Mr. Bracke, you were aware that Gary Milby was one of the

7   defendants that had been charged already in this case?

8   A.  Yes, sir.

9   Q.  Were you made aware of the fact that he was also a client of

10  Bryan Coffman's?

11  A.  I was aware of that fact from scanning the documents.

12  Q.  So you actually recall seeing documents that pertained to

13  the professional relationship between Mr. Milby and Mr. Coffman?

14  A.  Yes, sir.

15  Q.  Do you recall -- I know you can't recall any specific

16  document unless there was something astonishing in there.  Do

17  you recall whether any of those documents -- that is,

18  correspondence between Mr. Coffman and Mr. Milby -- made it into

19  the nonprivileged green files?

20  A.  Correspondence between Mr. Coffman and Mr. Milby that made

21  it to green?

22  Q.  What you call Nonprivileged?

23  A.  Sure, it is possible.  If it didn't seem to relate to

24  private matters related to legal representation, it would have

25  made it to green.  I can't tell you for sure what a specific

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Murphy**

135

1   document, where a specific document is.

2   Q.  Were you given a list of the various business entities that

3   Gary Milby was connected with that were also represented by

4   Mr. Coffman?

5   A.  There -- there were some of them noted in the affidavit for

6   a search warrant that I had.  There were some of them noted in

7   the indictment, I think.  I had -- I put together my own kind of

8   just a handwritten list of some of the businesses that were

9   involved, and as I went through the documents I would see

10  different ones.

11      So I didn't get a list as I started, other than Mid-American

12  -- there were two named mid-American something or other.  Those

13  were the ones I was aware of when I started.

14  Q.  So you were looking at some of this with that knowledge

15  about the relationship between Mr. Coffman and Mr. Milby, with

16  the idea that Mr. Milby may also be asserting a privilege?

17  A.  Oh, absolutely; yes, sir.

18  Q.  Did you go through any documents that had been seized or

19  taken from the office of an attorney by the name of Hunter

20  Durham, who also represented Mr. Milby?

21  A.  I know I saw documents with that name on it.  I don't know

22  what -- my understanding was that the source of the documents

23  came from Mr. Coffman's office.  I don't know where the

24  documents -- I couldn't say where the documents came from before

25  I got them.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
**Tony Bracke, Cross Examination by Mr. Murphy**

136

1   Q.  Okay.  Was there another filter team in place operating

2   independently in this case, other than yours --

3   A.  From my understanding --

4   Q.  -- and the one run by Sam Dotson?

5   A.  -- the only filter team was the one originally involving

6   Mr. Dotson and Ms. Poynter, and it was ultimately taken over by

7   myself and Ms. Leonhard.  I'm not aware of another filter team.

8   So the filter team work was done by either Mr. Dotson or me and

9   Ms. Leonhard.

10  Q.  So what I hear you say with regard to the Hunter Durham

11  documents, you're not aware that it was documents between the

12  Hunter law firm and the Milby law firm or whether it was

13  documents taken by search warrant from Hunter Durham's office?

14  A.  I would be uncomfortable speculating about the source of the

15  documents I got.  I only know that there were documents with his

16  name on it and that he was an attorney.

17         MR. MURPHY:  Thank you.  No further questions.  It

18  was good to see you again.

19         MR. MARSHALL:  No further questions.  May he be

20  excused?

21         THE COURT:  Me may be excused.

22      (Witness leaves the courtroom.)

23         THE COURT:  Mr. Marshall, how many more witnesses do

24  you have?

25         MR. MARSHALL:  Your Honor, I think we have pretty

**U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)**

137

 1  well summarized the issues and the matters you were concerned

 2  with, so we rest.

 3       THE COURT:  All right.  Mr. Romines, do you have any

 4  more witnesses?

 5       MR. ROMINES:  At this time, no, your Honor.  What I

 6  would like to do, because all of the documents that were

 7  referred to today were given to me right before we started,

 8  what I would like to do is have an opportunity to review the

 9  documents and brief the matter or request the Court for an

10  opportunity to take additional testimony, and I will be

11  responsible for subpoenaing the proper parties to that.

12    Without knowing what they classified as what, Judge, I'm

13  kind of flying blind here.

14       THE COURT:  Well, now, as I understand it from the

15  questions you asked Mr. Dotson, you said that you were given

16  a disk of all of the copies of the green documents in January

17  of 2010.

18       MR. ROMINES:  I had given -- I have been given all

19  the documents, so I have reviewed them all; however, I have

20  not reviewed how they classified them.  Does that --

21       THE COURT:  Has the United States never identified --

22  I mean, the green documents?

23       MR. MARSHALL:  Your Honor, the process literally just

24  ended late last week, as Mr. Bracke testified.  Mr. Romines

25  was given the entire universe between January and February of

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

1    2010.  At that time, it was not categorized by color.  Today,

2    he has been provided disks containing all documents

3    categorized by color.

4         THE COURT:  But this is the first time he's ever

5    gotten this?

6         MR. ROMINES:  Yes.

7         MR. MARSHALL:  We have been awaiting him to look at

8    the documents and tell us which ones he thought were

9    privileged.

10        THE COURT:  How could he look at them if he didn't

11   know how they were categorized?

12        MR. MARSHALL:  I don't know that that process would

13   change his calculus.  He told us every time they were all

14   privileged.

15        THE COURT:  Well, I understand that.  But if he knows

16   there's no dispute as to roughly 3,000 of them, those are not

17   in play.

18        MR. ROMINES:  Right, they are not.

19        THE COURT:  Those are not in play.  We are talking

20   about what everybody here has been referring to as green

21   documents.  I don't think, Mr. Romines, that you can contest

22   the notion that neither the yellow nor red documents have

23   been provided to the prosecution.  Are you contesting that?

24        MR. ROMINES:  No, that's not a problem, Judge.

25        THE COURT:  Mr. Renn, is that a problem for you?

U.S. v. Coffman, Detlog, 5:09-CR-181 (11/17/10)

1          MR. RENN:  No, your Honor.

2          THE COURT:  Mr. Murphy, is that a problem for you?

3          MR. MURPHY:  No, your Honor.

4          THE COURT:  So we are talking about the universe of

5     green documents.  Now, those were given to the defense when?

6     When were they identified as the green documents?

7          MR. MARSHALL:  Today, because the disclosure happened

8     on the 16th.

9          THE COURT:  So we are only talking about the green

10    documents?  Let's get this on the record.  First of all, all

11    the lawyers know that all the documents were taken, and you

12    have known what all the documents were all along.  Isn't that

13    right, Mr. Romines?

14         MR. ROMINES:  Yes, I have reviewed the documents,

15    your Honor.

16         THE COURT:  And Mr. Renn, you have known what the

17    documents were, the potential documents were, all along;

18    isn't that right?  You knew that all the documents from the

19    law office and all the documents from the house were taken;

20    isn't that correct?

21         MR. RENN:  Yes, your Honor.

22         THE COURT:  Mr. Murphy, you knew that, as well?

23         MR. MURPHY:  Assuming it was in the discovery that I

24    was provided, and I have no reason to believe otherwise.

25         THE COURT:  So basically, we are talking about

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

140

1   everything.  The United States has determined that all of the

2   documents are subject to use and not privileged, except for

3   3,000 of those documents.  Isn't that right, Mr. Romines?

4        MR. ROMINES:  That's my understanding, Judge.

5        THE COURT:  Isn't that right, Mr. Renn?

6        MR. RENN:  That's what it sounds like from the

7   hearing, your Honor.

8        THE COURT:  And Mr. Murphy, isn't that right?

9        MR. MURPHY:  Agree.

10       THE COURT:  Mr. Marshall, isn't that your

11   understanding?

12       MR. MARSHALL:  Absolutely, with the caveat that

13   Mr. Taylor, within the next couple weeks, will be narrowing

14   that to what he anticipates he will be utilizing at trial.

15       THE COURT:  I guess my point is is that the defense

16   wants to kind of have it both ways here.  You want me to say

17   that the sheer number of documents that the government has

18   disclosed suggests that this process was tainted either by

19   incompetence or dishonesty.

20       MR. ROMINES:  Well, Judge, I think it's more -- the

21   issue is this.

22       THE COURT:  The point is, it's wrong?

23       MR. ROMINES:  It's wrong.

24       THE COURT:  You don't agree with it?

25       MR. ROMINES:  It can't be done this way.  There's no

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

141

1    consistency to this.

2            THE COURT:  It's wrong?

3            MR. ROMINES:  It's wrong.

4            THE COURT:  And without anybody screwing it up on

5    purpose, it's screwed up.  I'm saying this in Lincoln County

6    terms.

7            MR. ROMINES:  That's correct.

8            THE COURT:  Mr. Renn, is that your position?

9            MR. RENN:  That's what it appears.  Again, I haven't

10   gone through it the way Mr. Romines has.  But the one

11   document, obviously here today the testimony was that two

12   people assigned to the taint team both looked at the same

13   document, and one says, "No, there isn't anything, it's a

14   business document," and the one says, "Oh, yeah, that's

15   privileged."

16           THE COURT:  And Mr. Romines made the point if all of

17   us in the courtroom -- and I see a lot of lawyers in the

18   courtroom -- look at this document, we would all have

19   different opinions.

20        Mr. Murphy, do you agree with that premise?

21           MR. MURPHY:  Absolutely.

22           THE COURT:  Here is what we're going to do, or else

23   we would spend the next year on this.  Let's assume that the

24   government has got it wrong.  There's a remedy for that, and

25   the remedy is requiring the government to submit to the Court

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

1    and to the defendants each and every document it intends to

2    use at trial.  All of those documents would be naturally

3    identified as green and not otherwise privileged.  And I mean

4    every document that Mr. Taylor has identified for us earlier

5    as approximately 1,000 documents containing approximately

6    12,000 pages.

7        As to the rest of it, if it's not being used,

8    Mr. Romines, what's the problem?

9        MR. ROMINES:  Judge, I think we're trying to, you

10   know, if they're getting documents that they were not

11   supposed to get in the first place, all right, it taints the

12   whole procedure.  I mean, if they're getting attorney-client

13   communications between Mr. Coffman and Mr. Milby and

14   Mr. Tsatskin, who are all three codefendants, it has tainted

15   this entire team.  I mean, it's --

16       THE COURT:  But isn't the remedy suppression of the

17   evidence?

18       MR. ROMINES:  And Judge, if that's my only remedy,

19   that's what I want to brief the issue on, Judge.  I don't

20   think -- because what happened here, there was a simple way

21   to avoid this, and that's to let the third party review this.

22       THE COURT:  What in the Sixth Circuit law requires

23   third-party review?  I've looked at this.  You all have had

24   six months to look at it, and nobody has written about it

25   yet.  So tell me now --

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 143 of 171 - Page
ID#: 1103
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

143

1      MR. ROMINES:  Well, Judge, before they even --

2      THE COURT:  -- before we go down this path.

3      MR. ROMINES:  I know they're not required to.

4  However, there's -- as the Court is well aware, there's very

5  little case law.  In fact, we are making it here today, I

6  believe.

7      THE COURT:  I believe that we are.

8      MR. ROMINES:  But the issue is, Judge, and especially

9  with the documents turned over today, they know we are

10 litigating this issue.  I mean, we -- we are fighting over

11 whether or not they are entitled to them in the first place;

12 not whether or not they are admissible, but even if they

13 should get them in the first place.

14     THE COURT:  But when should you have litigated that

15 if you didn't want them to have them?  Were you Mr. Coffman's

16 lawyer when the search was initiated?

17     MR. ROMINES:  I was, Judge, but --

18     THE COURT:  And you knew that they took everything

19 out of his office?

20     MR. ROMINES:  Well, actually it was filed under seal,

21 Judge, so I wasn't aware.

22     THE COURT:  But I guess the minute they came and took

23 the stuff out of his office, you knew within 15 minutes that

24 his office had been raided.  Is that a fair statement?

25     MR. ROMINES:  No, I wasn't representing him at that

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 144 of 171 - Page
ID#: 1804
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

144

1    time, Judge, but shortly thereafter I began representing him.

2              THE COURT:  Was it a month?

3              MR. ROMINES:  Close enough.

4              THE COURT:  I'm trying to make a point and not trying

5    to be difficult.  We don't need to obfuscate the obvious, and

6    I'm a little concerned that that's what we are doing here.  I

7    want this record to be clear and complete.

8         I'm going to give this defendant a remedy, let me assure

9    you, because this defendant is entitled to review all of the

10   documents that will be used against him and to have an

11   independent third-party determination as to whether these

12   documents -- all these defendants, rather -- are privileged.

13        The question before this Court is, do I dismiss an

14   indictment because he didn't get that remedy earlier, or do I

15   suppress the evidence as a remedy now?

16        Now, I'm going to look back at this record, and I'm

17   counting on you all, who are being paid big bucks, to tell me

18   the truth.  Number one, was there any request filed in any

19   court record at any time preindictment seeking the

20   intervention of a third-party master or a federal judicial

21   officer opposing this taint team, ever?

22             MR. ROMINES:  No.

23             THE COURT:  And you knew that everything in a

24   lawyer's office had been seized; is that correct?

25             MR. ROMINES:  Yes, your Honor.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

145

1          THE COURT:  All right.  Now, nothing was done at that

2    point.  Now, when was the first time, Mr. Romines -- and

3    Mr. Renn, you all jump in.  I'm not trying to be difficult,

4    but I need facts here.

5          MR. ROMINES:  Here's, Judge, the first -- when we

6    were first provided, "This is the documents we seized from

7    the law office," all right, we were in Judge Hood's court

8    shortly thereafter for arraignment.

9          THE COURT:  All right.

10         MR. ROMINES:  And he said, "Which documents are you

11   going to assert privilege to?"  In open court we said,

12   "Judge, we are asserting privilege to all of them.  They were

13   seized from his law office."

14         THE COURT:  But we all know that the Sixth Circuit

15   does not recognize general assertions of privilege to all

16   documents in a criminal case.  I mean, do you have any law to

17   the contrary?

18         MR. ROMINES:  I hope to find it, Judge.

19         THE COURT:  Well, you've had about a year.

20         MR. ROMINES:  But your Honor, I actually -- having

21   this hearing, I needed to know exactly what happened before

22   we could really address this issue, what they determined is

23   privileged, what they not determine is privileged, and how

24   they made those determinations.  That is really what I wanted

25   to get to today, more than anything, is "What did you base

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 146 of 171 - Page
ID#: 1106
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

146

1   the fact that this document is privileged and this one is

2   not?"

3          THE COURT:  But how does that change anything?

4          MR. ROMINES:  Judge, if they were -- you know, if

5   there's no consistency in how they review and the trial team

6   is given clearly privileged documents, that -- that taints

7   for good that trial team because they have been provided

8   information that they weren't entitled to otherwise.

9          THE COURT:  All right.  Well, here is what we're

10  going to do, is the case law in the Sixth Circuit does not

11  require -- Mr. Renn, Mr. Murphy, anything you all want to say

12  on this?  I don't want to cut you off, but we have been here

13  for three hours and all we are saying, all that I've heard so

14  far is "We question the procedures of the taint team, and

15  that the number of documents disclosed to the government as

16  nonprivileged suggests that it was a flawed process."

17         MR. ROMINES:  Okay.

18         THE COURT:  That's the evidence I've heard.

19  Anybody -- anybody got a different take on it?  Mr. Murphy,

20  you're standing up, so you better know.

21         MR. MURPHY:  Yes, your Honor.  I don't have a

22  different take on it, but I'm a CJA counsel in this case, as

23  the Court knows, and I didn't get those.  And I'm kind of in

24  the unique position if my client had been Mr. Coffman's -- if

25  my client hadn't been Mr. Coffman's client, then I would have

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

147

1    no dog in this fight.

2        But I would like to see -- I would like to have those

3    disks to look at the approximately 1,000 documents, because

4    I'm sure some of them have got my client's name on them.

5            THE COURT:  Yes.

6            MR. MURPHY:  And I don't want to have to rely on

7    cocounsel to burn me extra CDs and so forth.

8            THE COURT:  It sounds to me we are sort of in the

9    same place we would have been over a year ago; in other

10   words, you don't know what documents the government is going

11   to use, so you can't argue that they are privileged.

12           MR. ROMINES:  That's correct, Judge.  I don't know

13   what's been provided, what's privileged, what's not.

14           THE COURT:  Mr. Murphy, you don't know what your

15   client's documents -- you would assume if they took

16   everything from his attorney's office they would be in there,

17   wouldn't you?

18           MR. MURPHY:  I hope it's in the yellow and red, but I

19   suspect some of it's not.

20           THE COURT:  I understand.

21           MR. MURPHY:  The problem is, the government just

22   finished doing this like a week ago.

23           THE COURT:  I understand the problem, but we are sort

24   of coming around full circle, so the Court is going to have

25   to intervene here to clarify this record for the parties.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 148 of 171 - Page
U.S. v. Coffman, Detention, 5:09-CR-181 (11/17/10)
ID#: 1108

148

1      United States, you have got these documents and you have

2   had them for a long time.  Mr. Taylor told me he was ready

3   for trial back in September, so I don't really know why these

4   documents haven't been disclosed to the defense before now.

5      But all of these documents, these 1,000 documents

6   containing 12,000 pages that the government anticipates being

7   offered at trial, those are to be identified for the defense

8   forthwith.

9      The defense will then have the opportunity, as to each of

10  those 1,000 documents and 12,000 pages, to follow the Sixth

11  Circuit's directions with respect to asserting the privilege.

12  Defendants in the Sixth Circuit cannot assert that evidence

13  is privileged in a blanket fashion.  They've got to show me.

14     The defendant must prove the essential elements of the

15  privilege for each piece of evidence that he or she claims is

16  privileged.  Those elements are identified in United States

17  v. Goldfarb 328 F.2d 280, 281, a 1964 case.

18     Now, I recognize that a lot of these documents, even

19  though we're talking about a huge number of pages, could very

20  well be 200, 300, 400, 500 pages long.  We don't know.  So I

21  suspect some are one page, but there will be the full

22  spectrum.

23     Once those are identified, then I'm going to give you the

24  hearing you want, counsel for the defense.  And I or one of

25  our magistrate judges will give you the opportunity, as to

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 149 of 171 - Page
ID#: 1109
U.S. v. Coffman, Det. Hrg., 5:09-CR-181 (11/17/10)

149

 1    each of these pieces of evidence, to demonstrate whether or

 2    not that document is privileged.

 3        Now, in looking back at the universe of documents that

 4    government prosecutors have seen that they do not intend to

 5    use, you may then brief for me later whether or not you think

 6    that presents some additional grounds for dismissal of the

 7    indictment.  But we have got to get this in some kind of

 8    manageable form.  All of you lawyers have been dancing around

 9    over this issue long enough.  It's time for us to make

10    decisions.

11        As to the documents being used for trial, those need to

12    be disclosed forthwith.  I mean by the end of next week,

13    identified for the defense.

14        Now, defendants, how long is it going to take for you to

15    get this information to me?  We have a, what, February or

16    March trial date?

17        MR. ROMINES:  Judge, a month, possibly, depending on

18    what they are.  Judge, we probably should get Mr. Taylor

19    here, too.  We are continuing to receive discovery by the

20    thousands of pages.  We received another disk, a few disks of

21    discovery, last week.

22        THE COURT:  Well, you know, let's get -- we're not

23    taking any evidence.  Any objection to Mr. Taylor coming on

24    back in?

25        But this way, the defense is not prejudiced.  You can

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

150

 1   still argue that the whole thing ought to be thrown out, but

 2   we can move forward with the evidence that the government

 3   intends to use at trial.

 4       MR. ROMINES:  That's fine, your Honor.

 5       THE COURT:  So we have a procedure, at least.

 6       MR. ROMINES:  That's perfect.

 7       MR. MARSHALL:  Could we please move forward with the

 8   yellow documents in that same process, without Mr. Taylor or

 9   anybody else seeing them?

10       THE COURT:  I think you ought to turn the yellow

11   documents over to the defendants also by the end of next

12   week.  Do you have them, Mr. Renn?

13       MR. RENN:  I do not, your Honor.

14       THE COURT:  Mr. Murphy, do you have them?

15       MR. MURPHY:  I do not, your Honor.

16       THE COURT:  Okay.  Everybody gets them.

17       MR. MARSHALL:  Yes, ma'am.  The only reason we

18   haven't is a concern about the legal issues that might apply

19   to Mr. Coffman and not the others.  That's why we haven't

20   given them to the other defendants.  He is the purest one to

21   give that order.  He could possibly provide them to --

22       THE COURT:  You are thinking there are possibly some

23   documents, Mr. Murphy, that your client wouldn't want

24   Ms. Coffman to see?

25       MR. MARSHALL:  Or even third parties, unrelated, in

U.S. v. Coffman, Det al., 5:09-CR-181 (11/17/10)

151

1    the red documents.

2          THE COURT:  How do you anticipate handling that,

3    counsel?

4          MR. ROMINES:  Judge, I don't think -- at this point,

5    how can that be a problem?  Really?

6          THE COURT:  If we're talking about 400 documents.

7          MR. MARSHALL:  I can give one more set right now, if

8    the Court please.

9          THE COURT:  Or is a simpler method to have

10   Mr. Marshall put them in the record, agree that the United

11   States doesn't intend to offer them at trial, and leave it at

12   that?  And then, if you want to raise some other issue about

13   them later, we can do that?

14         MR. ROMINES:  Actually, Judge, filing them in the

15   record, I assume some of them relate to other clients of

16   Mr. Coffman's which would be disclosed.

17         THE COURT:  I can put them under seal and make them a

18   Court's exhibit.

19         MR. ROMINES:  I have no objection to that, your

20   Honor.

21         MR. MARSHALL:  Just to be clear, the United States

22   doesn't agree that they will not try to use the yellow.  We

23   need your opinion or a magistrate judge's opinion about what

24   we can see, what the trial team can see.

25         THE COURT:  You have got 30,000 documents.  Do you

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

152

1    really want to look at more, Mr. Marshall?

2         MR. MARSHALL:  The 400 is the yellow.  But I believe

3    that the United States is entitled to a full vetting of those

4    yellow documents.  I was sent here to argue that, and that's

5    what I'm going to do.

6         THE COURT:  Okay.  Well, if you want to vet it, we're

7    going to vet all of them, then, I guess.  So we will do it.

8       If the parties can work out -- I guess, if I want to give

9    the documents, first of all, to Mr. Coffman --

10        MR. MARSHALL:  Done.  It's already done.

11        THE COURT:  -- who would be able, then, to determine

12   among those documents if there's any privilege that would

13   apply to some of his other clients.

14        MR. MARSHALL:  That's fine, your Honor.

15      (Mr. Taylor enters the courtroom.)

16        THE COURT:  And then share that with Ms. Coffman and

17   the other defendants.

18      Is there any objection to that, Mr. Renn?

19        MR. RENN:  No, your Honor.

20        THE COURT:  Mr. Murphy?

21        MR. MURPHY:  No, your Honor.

22        THE COURT:  And that way, Mr. Coffman will know who

23   his clients are and he will be able to conduct that

24   screening.

25      Is there any objection from the United States?

1          MR. MARSHALL:  No, your Honor.

2          MR. ROMINES:  No objection to that, your Honor.

3          THE COURT:  You are going to do that, and you can get

4    that done in the next couple weeks?

5          MR. MARSHALL:  I will do that.

6          THE COURT:  It should be pretty obvious.  I think

7    Mr. Coffman can help you with that, and he should be able to

8    sift through it rather quickly.

9       Yes, Mr. Murphy?

10          MR. MURPHY:  Again, an observation, your Honor, that

11   goes back to the volume of the discovery.  I finally managed

12   to get through the initial 31,000 pages or whatever I had

13   initially.  I was given about two months ago, which I had not

14   even started yet, 10,000 pages of documents from the

15   Securities and Exchange Commission investigation of my

16   client.  Then we got the materials next week, now we're going

17   to get another, what, 1,000 pages.

18      I know you gave it the old Waynesburg, Lincoln County,

19   "This case will be tried in February when I said it was going

20   to be tried."

21          THE COURT:  That's because you said you wanted it

22   done real quick.

23          MR. ROMINES:  He did.

24          THE COURT:  Yeah, that's right.  Okay.

25          MR. ROMINES:  I have never rushed a white-collar case

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 154 of 171 - Page
U.S. v. Coffman, Det. al., 5:09-CR-181 (11/17/10)
ID#: 1214

154

1    to trial, your Honor, and don't know when I'm going to start.

2            THE COURT:  Okay.

3            MR. MURPHY:  That's just my worry.  It's still my

4    worry that we won't be ready to go.

5            THE COURT:  I understand.

6            MR. ROMINES:  Your Honor, based on the discovery that

7    we continue to receive -- and Mr. Coffman actually wants to

8    go; however, I would be malpracticing going forward getting

9    so many documents still and trying to figure out how they fit

10   in with the other documents.

11           THE COURT:  And Mr. Renn, I understand your problem,

12   too.  I don't want to leave you out.  I know what your

13   problem is.

14       What I propose that we do is, if you think it's going to

15   take you a month to go through the documents, then you're all

16   going to have to formulate your arguments.  What I would

17   propose is that we use February 24th, I believe, which is our

18   trial date.  Is that right?  What is it?

19           MR. ROMINES:  The 28th.

20           THE COURT:  The 28th, which is our trial date, and

21   that we set aside whatever time is necessary to hash this out

22   over this evidence.  After we have done that, then we would

23   be in a position to set a new trial date.

24       And Mr. Renn, depending on what the Court's ruling is

25   with respect to the evidence in that case, I would give you

U.S. v. Coffman, et al, 5:09-CR-181 (11/17/10)

155

 1   permission to reassert your motion for a severance, if it

 2   appeared in order.  I'm not saying whether I will grant it,

 3   but that I would at least consider it in light of what we

 4   find.  I don't want to make any promises.

 5        MR. ROMINES:  Your Honor, that is acceptable with me,

 6   because, Judge, based on the evidence that we continue to

 7   receive, we're going to have some fairly substantial motions

 8   that we'll have to litigate.  The Morrison case, the Supreme

 9   Court case Morrison regarding extraterritorial jurisdiction

10   of securities laws, I think will play a role in this case.  I

11   will have a motion regarding that matter coming within the

12   week because I think it's directly on point with the issues.

13        THE COURT:  Not as to these evidentiary issues, but

14   as to a separate issue?

15        MR. ROMINES:  Yes, a separate issue.

16      I think the procedure the Court has laid out today is

17   perfect for resolving this matter.

18        THE COURT:  All right.  Okay.  Mr. Marshall,

19   Mr. Taylor, do you all have any objections to that?

20        MR. TAYLOR:  It's my memory that the Court set a

21   drop-dead date for motions, and that's long since past.

22        MR. ROMINES:  We still get discovery every week.

23   We're receiving discovery every -- in fact, your Honor had

24   advised that motions that are based on evidence that you

25   receive, just continue to file them.  That is --

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

156

 1          THE COURT:  Is it newly discovered material or newly

 2   discovered case law on which you would file your motion?

 3          MR. ROMINES:  The Morrison case was about four months

 4   ago, Judge, and the material was received from the Ontario

 5   Securities Division, and the interviews they did with

 6   Canadian citizens probably a month ago.

 7          THE COURT:  Mr. Taylor?

 8          MR. TAYLOR:  It's been some time since we got the

 9   Ontario Securities Commission.

10          THE COURT:  I'm not particularly familiar with the

11   Morrison case.

12          MR. TAYLOR:  But here is the problem we're going to

13   have.  A case with this many tentacles, it implicates the

14   Bahamas, it implicates Canada, it implicates Panama and Swiss

15   bank accounts.  We have MLAT requests in all over the world

16   on this case.  And this stuff trickles in, and if it comes in

17   in time for trial, we'll use it; if it doesn't, we wouldn't.

18   But I'm not going to stop and take my foot off the pedal just

19   because we don't have a trial date right now.

20      So we are always going to have this issue on the next

21   load of documents I get from an MLAT.

22          THE COURT:  I understand.  But the real issue we have

23   in this case is that, until today -- until today, the defense

24   in this case does not know the evidence that the government

25   intends to offer at trial so that we can have the necessary

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

1  hearing that the Sixth Circuit requires us to have with

2  respect to privilege.

3      I can't help that.  The United States gathers evidence

4  and determines when it indicts a defendant.  If it indicts a

5  defendant early, it has problems.  If it indicts a defendant

6  late, it has problems.

7          MR. TAYLOR:  Correct.

8          THE COURT:  These are the problems that we are all

9  left with.

10     Mr. Romines, I will caution you, Mr. Taylor's words have

11 a ring of truth in that I can't just keep hearing motions as

12 a method of delay, and I think that we want to avoid that

13 here.

14     If this is truly a new issue, based on the evidence that

15 has come to the defendants' attention in recent months, and

16 as we will be having a hearing on another matter at the end

17 of February, I will permit you to brief it.

18         MR. ROMINES:  Thank you, your Honor.

19         THE COURT:  But generally speaking, I don't just let

20 motions trickle in as people feel like filing them.

21         MR. ROMINES:  And I don't file them -- as a matter of

22 fact, I don't file them unless I feel they have a legitimate

23 issue available.

24         THE COURT:  This will happen to fit just about in the

25 perfect timeline on the hearing of the evidence -- on the

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

158

 1    evidentiary issue involving privilege; therefore, I don't

 2    think it will result in a further delay of the trial.

 3         MR. ROMINES:  And Judge, what I will do is, any other

 4    substantive motions that I have, I'll file them before that

 5    time so we can attempt to resolve them on that February date.

 6    Is that acceptable?

 7         THE COURT:  What other substantive motions would you

 8    anticipate filing before February?  We have had our

 9    suppression motion.  We have had about everything I can think

10    of.

11         MR. ROMINES:  Judge, they are more concerning with

12    extraterritorial jurisdiction.  We have problems bringing

13    Canadian issues here.  In fact, we can't bring them here,

14    even if they are exculpatory.

15         THE COURT:  These sound like evidentiary issues.

16         MR. ROMINES:  Actually, Judge, I think they more

17    implicate Constitutional rights of compulsory process.  I

18    mean, I have exculpatory witnesses in Canada with no method

19    of getting them here.

20       That's one of the reasons why Morrison, it will dovetail

21    with that issue.  That's why we don't charge people with

22    crimes that occur in Canada, because you can't produce the

23    witnesses in the case.  And MLAT is insufficient, because we

24    are having to take depositions that inform the government of

25    what our defense would be prior to trial.

Case: 5:09-cr-00181-KKC    Doc #: 173    Filed: 11/20/10    Page: 159 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1210

159

 1      So those are the types of issues that I'm already aware

 2   of.  I'm working on briefing them and preparing the motions

 3   as we speak, but I know that I've already identified them as

 4   problems.

 5          THE COURT:  So they're all related to the

 6   extraterritorial jurisdiction?

 7          MR. ROMINES:  Most of them are related to the

 8   extraterritorial jurisdiction.

 9          THE COURT:  Okay.  Mr. Taylor?

10          MR. TAYLOR:  Well, it would be ironic, in my opinion,

11   that we would allow someone to set up an international sham

12   that's claimed as a shield.

13          MR. ROMINES:  Judge, we will deal with that at trial.

14   I'll brief that.

15          MR. TAYLOR:  I will put on the record that I have

16   requested reciprocal discovery and haven't got a page yet.  I

17   would like to address that, too.

18          THE COURT:  Is there any, Mr. Romines?

19          MR. ROMINES:  All of the discovery I had would be in

20   my client's law office, which they took.

21          THE COURT:  So your answer is, there is none?

22          MR. ROMINES:  Yes.  They took it all.

23      The one other issue, Judge, that can be considered

24   reciprocal discovery, if they don't already have it, is there

25   were tens of thousands of e-mails between Mr. Coffman and

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

160

1    Mr. Tsatskin that were not provided to me in the initial

2    universe of discovery that they supposedly took from his

3    office and off his computers.

4        Now, actually, Judge, I was going to wait until they

5    didn't provide it to me and then complain about it, but I

6    don't want to do that now.

7            THE COURT:  Well, they may not have provided it

8    because it's in the privileged stuff.

9            MR. ROMINES:  No, they didn't give it to me at all.

10   They've never provided it to me.  If it was in the documents

11   that they said that they have already given me, I don't have

12   it.  There are literally tens of thousands, more so.  42,000

13   is not enough to encompass all the documents.  And they took

14   them off the servers in Mr. Coffman's office.

15           MR. TAYLOR:  Let me say this.  We mirrored hard

16   drives and gave the hard drives back, so if there is

17   something on there, we've got it.

18           THE COURT:  How would the government -- if you have

19   the hard drive, you have everything; right, Mr. Romines?

20           MR. ROMINES:  Well, I don't know that, Judge.  I

21   don't know what all they took that I don't have.  I've got

22   some e-mails; however, I don't know if they took additional

23   ones that they have not provided to me, because they haven't

24   provided me any.

25           THE COURT:  Mr. Romines, that's about the most

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

161

1  circular argument that I have ever heard.  It's late in the

2  day.

3       MR. ROMINES:  Here's what I know, Judge.  They

4  seized -- they seized computer hard drives that contained

5  e-mails, right?

6       THE COURT:  Right.

7       MR. ROMINES:  Now, I have some.  However, they've not

8  given me any that I know they've got.  Do you understand what

9  I'm saying there?

10       THE COURT:  Okay.  If they seized the computer hard

11  drives, the government then would have downloaded the

12  information from those hard drives; is that correct,

13  Mr. Taylor?

14       MR. TAYLOR:  That's what I've been told.  I wasn't

15  there.

16       THE COURT:  Well, who did it?  Who knows?

17       MR. MARSHALL:  Your Honor, I've interviewed people

18  involved in the process.  What I understand to have happened

19  from Lexington is there was a computer and there was a

20  server.  Each one of the computers were mirrored or imaged

21  on-site.  The server had two hard drives that were

22  essentially mirroring each other for safety's sake.

23       THE COURT:  For backup.

24       MR. MARSHALL:  Mr. Coffman's partner said, "You can't

25  shut me down."  So the tech says, "Let me take one of the two

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 162 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1212

162

1    hard drives, and I will return it to you." He took it, he

2    imaged it, he returned it.

3        There was a general key word search done on all the

4    computer files that were taken from Lexington, and there was

5    a vetting of things that didn't match any of the hot key

6    words that the government had been provided.  That stuff was

7    not looked at, we never had anything to do it with it.  It is

8    under lock and key in Cleveland.  The things that came back

9    with hot words or names of individuals were provided.

10           THE COURT:  So you had to have some way of filtering

11   it?

12           MR. MARSHALL:  So that's the only part that was ever

13   provided to the filter team.

14           THE COURT:  So you have the hard drive with

15   everything from Mr. Coffman's office; is that correct,

16   Mr. Romines?

17           MR. ROMINES:  I assume so, Judge.  I have a hard

18   drive with lots of e-mails.  However, I was under the

19   impression that the government also took it and mirrored it

20   and would have provided it back to me to make objections.  I

21   never got anything back, which causes me concern that I don't

22   have everything that there is.

23           MR. MARSHALL:  Judge, I'm left believing simply along

24   the way that if that technician in Cleveland missed some key

25   words, shame on us.  He's been provided the computer files

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

163

 1 that were searched by the filter team.  These were the only

 2 ones that could ever be turned over to the trial team,

 3 period.  If we missed something along the way, that's our

 4 fault.

 5      THE COURT:  If the government missed things along the

 6 way, then the government doesn't have the evidence to use

 7 against your client.  Is that correct, Mr. Romines?

 8      MR. ROMINES:  Unless it's exculpatory, Judge.

 9      THE COURT:  But you just told me you have it.

10      MR. ROMINES:  Again, I may have everything that they

11 have.  Okay?  That is possible.  However --

12      THE COURT:  You know, we have to talk in reality, not

13 possibilities.

14      MR. ROMINES:  I don't know what they got, because I

15 didn't get any of the same things that I assume they took.

16 Do you understand what I'm saying, Judge?

17      THE COURT:  I think I do.

18    Mr. Murphy?

19      MR. MURPHY:  Yes.  This addresses Mr. Ken Taylor's

20 statement about reciprocal discovery.  I just want to make a

21 record here in court.  I don't have anything physically now.

22 There are some things out there I can tell Mr. Taylor about.

23 One is at some point in time several computers were taken out

24 of my client's home by a receiver acting on an order of a

25 Judge regarding collection of assets in a civil case.

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 164 of 171 - Page
U.S. v. Coffman, Det al4, 5:09-CR-181 (11/17/10)
ID#: 1224

164

1    That was brought up with Judge Hood, and he ordered the

2    return of the hard drives, which they didn't do for like two

3    months until I filed another motion saying, "Where's my

4    stuff?"

5    Two days later, after Judge Hood I think made it clear

6    that he wanted this stuff returned, I got the computers back

7    in a box at my office, only to learn that they had copied the

8    hard drives, which to me violated 100 percent the purpose of

9    Judge Hood saying "Give the hard drives back.  You can take

10   the computers, but you can't take the hard drive to get

11   information that may or may not incriminate someone, when all

12   you are doing is collecting property to settle a debt that's

13   owed."

14   So he can talk to his cohort down in Tennessee who is

15   getting ready next month to prosecute my client for the

16   identical deal that he's being prosecuted here for.  I don't

17   know how many weeks that trial will take.  My client may not

18   even be available in February.  He may still be in that trial

19   down there.

20   What he has to defend himself in this case, the physical

21   hard copy and papers, that sort of thing, the Public

22   Defender's Office in Nashville has those.  And I assume,

23   depending on what their strategy is, they will introduce that

24   in the trial down there.  So that's out there, too.  I have

25   no way of getting my hands on it.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

1          THE COURT:  It will be public record if it's

2    introduced.

3          MR. MURPHY:  It will if it becomes exhibits, if they

4    decide to scan it or put it in physically, the old-fashioned

5    way, whatever they do.

6       So there's my physical discovery, whatever it is.  That's

7    all I know about it, what's on the computer hard drives and

8    plus what the federal prosecutor has in Nashville -- Baker, I

9    believe is the attorney's name.  So I physically don't have

10   anything to give him.

11         THE COURT:  Mr. Renn, do you have anything?

12         MR. RENN:  I do not, your Honor.

13         THE COURT:  You're just trying to be real quiet,

14   aren't you?

15         MR. RENN:  I saw that.  I will be under the table

16   next time.

17         THE COURT:  All right.  Mr. Taylor, Mr. Marshall?

18   Anything else?

19         MR. MARSHALL:  Nothing, your Honor.

20         THE COURT:  Mr. Romines, I really don't know what I

21   can do to remedy the prospect of the problem that you raise,

22   except to say this:  I've ordered the government to provide

23   the defendants with everything that they intend to use

24   against them.  And if you get something in there that you

25   don't have in your computer drive, it should alert you to the

Case: 5:09-cr-00181-KKC   Doc #: 173   Filed: 11/20/10   Page: 166 of 171 - Page
U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)
ID#: 1126

166

1    possibility of a reality of that problem.

2              MR. ROMINES:  Okay.

3              THE COURT:  I don't know what else to do for you.

4              MR. ROMINES:  That's fine, Judge.  I guess, if I've

5    got them, I should just give them to them, not assume that

6    they already had them since they copied the computer.

7              THE COURT:  I would hope, since they copied the

8    computer, they have them.  But you all can talk about that,

9    and if you think there's a problem you can bring that to my

10   attention at or about the time of the hearing.

11         But I think it would make sense for us to set a new trial

12   date after we have had our hearing here on the 28th.

13   In the meantime, I think what we should do is have a

14   telephone conference once everybody has got all this

15   information among themselves, and you can start preparing

16   your presentation.

17         Let's talk in about three weeks to see how much time you

18   think this hearing will take and what kind of form we see it

19   taking.  I'm going to rely on the parties not to belabor

20   this.  Also, I'm going to rely on the defense to look

21   carefully at the case law in terms of asserting its

22   privilege.

23         You have, indeed, a heavy burden, and I will expect it to

24   be met.  And I will expect the United States to be prepared

25   to defend its position, as well.

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

167

1       If there is anything that the parties can agree on at the

2   hearing, it will be much appreciated.  I doubt that we will

3   have too much luck on that.  It is approaching the holiday

4   season, so maybe good cheer will rule here.

5       So let's convene at 9:00 on the 28th.  My secretary is

6   here.  Let's look for a date in December.  What about

7   December the 16th for a telephone conference, counsel, in the

8   afternoon at 1:00?

9           MR. ROMINES:  No objection to that, your Honor.

10          THE COURT:  Mr. Taylor?

11          MR. TAYLOR:  I'm getting my calendar.

12          THE COURT:  Mr. Murphy?

13          MR. MURPHY:  I'm good.

14          THE COURT:  Mr. Renn?

15          MR. RENN:  Anything, your Honor.

16          MR. ROMINES:  Your Honor, counsel are allowed to

17  bring in our cell phones as long as they are turned off?

18          THE COURT:  As long as they are turned off.  The CSOs

19  have been advised.  They will take them, and I will destroy

20  your SIM card with great joy if they go off in court.

21          MR. MURPHY:  Is there a rule, your Honor, with regard

22  to electronic equipment other than phones?  I'm lost without

23  my computer.  I was told that I had to check with the chief

24  judge regarding the electronics.

25          THE COURT:  I can grant it with respect to my case,

**U.S. v. Coffman, Det al.8, 5:09-CR-181 (11/17/10)**

1   and I will enter an order in this case that the CSOs will

2   have available to them downstairs that we can do this, given

3   the complexity of the case.

4        MR. TAYLOR:  Your Honor, December 16th I'm not

5   available.

6        THE COURT:  Okay.  What about the 15th at 1:00?

7   Mr. Romines?

8        MR. ROMINES:  That's fine, your Honor.

9        THE COURT:  Mr. Renn?

10        MR. RENN:  Yes, your Honor.

11        THE COURT:  Mr. Murphy?

12        MR. MURPHY:  That's fine, your Honor.

13        THE COURT:  Okay, 1:00 on December 15th.  What I want

14   you to do then is be prepared to talk to me about how we're

15   going to proceed in this case.

16        MR. ROMINES:  And that's telephonic?

17        THE COURT:  Yes, telephonic.

18     Mr. Coffman, Ms. Coffman, and Mr. Tsatskin -- and I

19   apologize, I want to keep calling the defendant, Mr. Coffman,

20   Mr. Tsatskin; and I apologize, just because they are listed

21   in that order.

22     You have the right to be present at the hearing.  If you

23   want to participate by phone with your counsel, you may.  We

24   will connect you on a separate phone call if you can't be

25   present physically with them.  Or if you wish to waive your

U.S. v. Coffman, Detc., 5:09-CR-181 (11/17/10)

169

 1    right to be present, again, we're going to be talking about

 2    procedure rather than substance on this phone conversation.

 3        So counsel, please advise me as to whether or not your

 4    client wishes to be present or whether they will waive their

 5    appearance.

 6            MR. ROMINES:  I will, your Honor.

 7            THE COURT:  Mr. Renn?

 8            MR. RENN:  Yes, your Honor, we will waive.  Thank

 9    you.

10            THE COURT:  And Mr. Murphy?

11            MR. MURPHY:  With what we're going to be talking

12    about, it's something that I can relate to my client, we will

13    waive.

14            MR. ROMINES:  Can I just waive that day?

15            THE COURT:  You may.  But again, if they choose to

16    participate, we'll get them on the phone.

17        Mr. Taylor, do you want to waive Mr. Marshall's presence?

18            MR. MARSHALL:  Judge, I have needed a break for about

19    20 minutes.  I really wish you would.

20            THE COURT:  Thank you all very much.  I know this is

21    an incredibly important issue to everyone in this case, and

22    we need to get it resolved in a way that's fair to both

23    sides.  Hopefully, we will get that done here shortly.  I

24    will be talking to you on the telephone and look forward to

25    any motions that you want to file on this jurisdictional

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

170

1    issue, Mr. Romines.

2        MR. ROMINES:  Thank you, Judge.

3        THE COURT:  That concludes this hearing.  I have a

4    sentencing hearing that was supposed to start at 4:30.  Let's

5    take ten minutes, and then we'll be back and convene on that

6    matter.

7        (Proceedings concluded at 5:18 p.m.)

8        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
9

10       /s/Rhonda S. Sansom                    11/19/2010
      _____      _____
11       Rhonda S. Sansom, RPR, CRR                 Date

12               ORIGINAL TRANSCRIPT FILED ELECTRONICALLY

13                           I-N-D-E-X

                                                        Page
14
     Government's Witnesses:
15
     Testimony of WILLIAM SAMUEL DOTSON:
16       Direct Examination by Mr. Marshall          13
         Cross Examination by Mr. Romines            50
17       Cross Examination by Mr. Renn               73
         Cross Examination by Mr. Murphy             84
18       Redirect Examination by Mr. Marshall        86
         Recross Examination by Mr. Romines          88
19
     Testimony of TONY BRACKE:
20       Direct Examination by Mr. Marshall          99
         Cross Examination by Mr. Romines           117
21       Cross Examination by Mr. Renn              127
         Cross Examination by Mr. Murphy            134
22

23

24

25

U.S. v. Coffman, et al., 5:09-CR-181 (11/17/10)

171

1                          E-X-H-I-B-I-T-S

2    Government's                                      Page
     Exhibit No.                                       Admitted
3

4    No. 3      Memorandum from K. Taylor regarding
                Instructions on Taint Team Procedures     15
5

6    No. 1      Letter to Department of Justice
                Requesting Permission for Search
                Warrant for Coffman Law Office            17
7

8    No. 2      Letter from Department of Justice
                Granting Permission for Search
                Warrant for Coffman Law Office            17
9

10   Nos. 4     Disk of Nonprivileged Documents
                Provided to Trial Team, March 2009        35

11   No. 6A     Disk of Nonprivileged Documents
                Provided to Trial Team, May 2009          35
12

13   No. 6B     Disk of Nonprivileged Documents
                Provided to Trial Team, May 2009          35

14

15   Nos. 5     Disk Labeled "Postal 12/5/09"             45

16   No. 7      Disk Labeled "Postal 11/13/09"            45

17   No. 8      Disk of Green Documents Provided to
                Trial Team on 11/10/10                    115

18   No. 9      Disk of Green Documents Provided to
                Trial Team on 11/15/10                    115
19

20   No. 10     Disk of Final Disclosure Provided to
                Trial Team by Postal Service              115

21

22   Defendants'                                     Page
     Exhibit No.                                      Admitted
23

24   No. 1      Letter from Bryan Coffman to
                Gary and Wanda Milby re Lone Star-1       124
25